**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | CHAPTER 11 |
| | : | |
| STEPHEN TODD WALKER | : | Case No. 20-13557 (ELF) |
| | : | |
| | : | |
| Debtor. | : | |
| | : | |

**DEBTOR'S OBJECTION TO CREDITORS JOHN E. SCHADE AND MARILYN SCHADE'S MOTION TO (A) CONTINUE HEARING TO CONFIRM DEBTOR STEPHEN TODD WALKER'S FIRST AMENDED PLAN FOR REORGANIZATION FOR SMALL BUSINESS UNDER CHAPTER 11 SCHEDULED FOR FEBRUARY 10, 2021 AT 2:00 P.M. AND (B) FOR EXPEDITED CONSIDERATION**

Stephen Todd Walker, the above-captioned debtor and debtor-in-possession (the "Debtor"), by and through his undersigned counsel, hereby objects to the above described motion (the "Motion") as follows:

**Introduction**

Over five months since the commencement of the within chapter 11 case, over 1 month since the expiration of the plan objection deadline and after advising the Debtor and this Court that only one of their numerous plan objections were being advanced, John and Marilyn Schade (the "Schades"), who have actively participated in this case since shortly after its commencement on September 1, 2020, have filed, one day prior to the Debtor's confirmation hearing, a procedurally improper motion seeking to continue the plan confirmation hearing in order to burden the estate with the time and cost of unnecessary discovery with respect to an issue that could have (and should have) been raised months ago regarding the propriety of the Debtor's chapter 11 bankruptcy case on

Page | 1

the basis that the Debtor is a "stockbroker" and, thus, statutorily prohibited from filing a

chapter 11 case.

The Schades suggest in a footnote that all of this could have been avoided if the

Debtor simply provided them with a copy of his employment agreement, which oddly

enough, could be corroborative of whether or not the Debtor is a "stockbroker," but in and

of itself is not dispositive of the issue that the Schades belatedly raise.  Accordingly, the

Debtor finds the Schades' footnote reference dubious insofar as the provision of an

employment agreement seems unlikely to satiate the Schades and their obvious campaign

to derail the Debtor's reorganization at all costs.

Curiously, but not surprisingly, the Schades fail to offer any explanation as to why

this issue was not raised months ago or why they did not previously engage in their

sudden need for 11th hour discovery.  The Schades also fail to mention their history of

engaging in reprehensible behavior with the Debtor's prior employer, which gave rise to

the Debtor being terminated by his former employer as well as civil claims filed by the

Debtor against the Schades for defamation, commercial disparagement and tortious

interference with a contract.

In spite of the dubious motives fairly attributable to the Schades and their alleged

pattern of unlawful behavior when it comes to the Debtor's employment, the Debtor

understands that this Court has an obligation to ensure that the Debtor's eligibility for

chapter 11 is scrutinized and ultimately approved.  Accordingly, for the reasons set forth

herein, the Debtor has little doubt that he is not a "stockbroker" and has otherwise taken

all necessary steps to demonstrate that he can avail himself of chapter 11 as a proper

mechanism to reorganize his affairs.

### Facts Relevant to The Stockbroker Inquiry

1.      As stated in filings with this Court by the Debtor, the Debtor was employed by

Aegis Capital Corporation ("Aegis") as of the filing of his chapter 11 bankruptcy case on

September 1, 2020.

2.      Prior to being employed by Aegis, the Debtor was employed by Royal Bank of

Canada ("RBC").

3.      While employed by RBC, the dollar amount of RBC customers managed by the

Debtor fluctuated, but were often in the range of up to $250 million dollars.

4.      When the Debtor became employed by Aegis, some of the RBC customers

moved their accounts to Aegis so that the Debtor could continue to provide them with

investment advice, but the RBC customers managed by the Debtor have the unfettered right

and option to have their funds managed by whomever they choose, including by RBC, Aegis

or some other entity.

5.      The Schades seem to overlook the basic fact that customers decide who

manages their funds and where those funds will be invested; accordingly, the Debtor's

compensation by Aegis is reflective of the fact that only some of the RBC customers for

whom the Debtor provided investment advice have been transferred to Aegis.

6.      But, that does not mean that the once robust amount of funds managed by the

Debtor while at RBC are somehow still being managed by the Debtor.  Indeed, to the

contrary, the Debtor does not manage funds for any customer outside his employment by

Aegis.

7.    The Debtor is compensated by Aegis as an employee on a W-2 basis only to the

extent that he manages funds for customers who choose Aegis.

8.    If the Debtor provides financial advice to an Aegis client/customer (which is

generally done by telephone or meeting) and the Aegis client/customer directs some action

to be taken on the advice given by Debtor (e.g., a purchase, sale or trade), the Debtor is

required to contact Aegis in New York, and Aegis then executes on the customer's directive.

9.    Coincidentally, RBC, which was the Debtor's prior employer, custodies/houses

the customer assets for Aegis.

10.    Once the purchase, sale or trade occurs, Aegis mails or emails a confirmation

directly to the Aegis customer.

11.    There is no principal or agent relationship between the Debtor and Aegis

clientele.

12.    New accounts are established by the customer directly with Aegis.

13.    Any monies from the Aegis customer go directly to Aegis; indeed, the Debtor

never handles any Aegis customer money, deposits or other assets.  Funds are mailed, sent

via a wire or done electronically with Aegis.

14.    Security transfers are done through the ACAT system, again, directly by the

Aegis customer to Aegis.

15.    Debtor never handles or has access to any customer cash or securities.

16.    In the ordinary course of his employment at Aegis, the Debtor does not have

access to, hold or maintain any client bank accounts, or client custodial accounts, does not

receive or hold any client checks, cash or securities from Aegis customers, and holds no

Aegis customer property or securities of any kind.

17.    Although Debtor advises Aegis clients regarding investment options and

transactions, he does so as an Aegis employee.

18.    Debtor is paid by Aegis, not by any particular client.

19.    Aegis clients entrust their funds and securities to Aegis and RBC, not the

Debtor.

### The Debtor's Proactive Steps to Address His Chapter 11 Eligibility

20.    Being aware that a "stockbroker" is ineligible to file a chapter 11 bankruptcy

case, prior to the filing of the within case, Debtor's counsel contacted this Office of the United

States Trustee (the "OUST") to inquire whether there was any mechanism or template used by

the OUST to confirm that an individual seeking to file chapter 11 case did not meet the criteria

of a "stockbroker."

21.    Counsel was advised that there was no such pre-filing procedure used by the

OUST, but instead, once the case was filed, the OUST would conduct an inquiry or

investigation to ensure that the Debtor was not a "stockbroker."

22.    Against this backdrop, the Debtor filed his chapter 11 case on September 1, 2020.

23.    The very next day, on September 2, 2020, the OUST contacted Debtor's counsel

requesting information on the Debtor's current position with Aegis, which again was the

Debtor's employer at the time of the bankruptcy filing.

24.    On September 8, 2020, Debtor's counsel provided the OUST with extensive explanations to the OUST's inquiry.

25.    On September 9, 2020, the OUST had some follow up inquiries, which were addressed by Debtor's counsel the same day.

26.    The Debtor believes, and therefore avers, that the explanations provided to the OUST satisfied the OUST that the Debtor was not a "stockbroker" and therefore was eligible to be a chapter 11 debtor.

**The Debtor is Not a "Stockbroker"**

27.    The Bankruptcy Code defines the term "stockbroker" as meaning a person –

   (A) with respect to which there is a customer, as defined in section 741 of this title; and

   (B) that is engaged in the business of effecting transactions in securities (i) for the account of others; or (ii) with members of the general public, from or for such person's own account.  *See* 11 U.S.C. § 101(53A).

28.    The Bankruptcy Code defines "customer" as, *inter alia*, an "entity with whom a person deals as principal or agent and that has a claim against such person on account of a security received, acquired, or held by such person in the ordinary course of such person's business as a stockbroker, from or for the securities account or accounts of such entity . . . . *See* 11 U.S.C. § 741(2).

29.    As set forth above, Aegis is the principal or agent of the customer and it is Aegis

against whom the Aegis clients would have a claim by virtue of any security held by Aegis on

behalf of the Aegis customer.

30.    The Debtor is an employee of Aegis and does not have his own customers;

accordingly, the Debtor is not a "stockbroker" as that term is defined in the Bankruptcy

Code.

WHEREFORE, the Debtor respectfully requests that the Court enter an order,

substantially in the form submitted and grant such other and further relief as is just and

proper.

Dated: February 10, 2021                    SMITH KANE HOLMAN, LLC


By: ___*/s/ David B. Smith*_____
David B. Smith, Esquire
112 Moores Road, STE 300
Malvern, Pa 19355
(610) 407-7217
dsmith@skhlaw.com
Counsel for the Debtor