**UNITED STATES BANKRUPTCY COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| Stephen Todd Walker | : |
| | : Case No. 20-13557 (ELF) |
| Debtor. | : |

**CREDITORS JOHN AND MARILYN SCHADE'S MEMORANDUM OF LAW IN SUPPORT OF THEIR OBJECTION TO DEBTOR'S FIRST AMENDED PLAN OF REORGNIZATION OF SMALL BUSINESS [DOC 146]**

Creditors John E. Schade and Marilyn Schade (collectively, "**Schade**") by and through their undersigned counsel, respectfully submit this Memorandum of Law in Support of their Objection to Debtor's First Amended Plan of Reorganization of Small Business [Doc 146].

**I.    RELEVANT BACKGROUND**

On September 1, 2020, Debtor Stephen Todd Walker ("Debtor") filed a voluntary bankruptcy petition (the "**Petition**") [Doc 1] under Chapter 11 in this Court.  Schade thereafter filed a timely Proof of Claim [Claim No. 9] as secured Creditors of Debtor pursuant to an equitable lien (the "**Equitable Lien**") securing funds loaned to then Debtor in the amount of $315,825.10 (the "**Loaned Funds**").  *See* Proof of Claim [Claim No. 9], a true and correct copy of which is attached hereto, incorporated herein and marked as **Exhibit "1"**.  The Equitable Lien encumbers real property owned solely by Debtor located at 1150 Youngsford Road, Gladwyne, Pennsylvania (the "**Gladwyne Property**") which is not Debtor's primary residence.

Debtor filed his Plan of Reorganization for Small Business Under Chapter 11 [Doc 72] ("**Debtor's Plan**"), which has since been amended.  The current plan under consideration by the Court proposes a three-year term, in which the unsecured creditors are paid nothing in the first

year, $87,178,44 in the second year, and $71,935.44 in the final year. These amounts are disproportionately low as compared to the $32,000 Debtor will retain every month of the three-year term to pay for his own household expenses and related reserve. Allowing Debtor to maintain his residence located at 611 Rose Lane, Bryn Mawr, PA ("Debtor's Residence") - a 6 bedroom, 6 bathroom, 4773 square foot mansion worth well over $1,000,000 and in which Debtor resides alone – seemingly contradicts every element of the good faith standard. At a cost of $32,000 per month, this creates a negative cash flow in his plan and allows the Debtor to keep $1,152,000 in his possession and away from his creditors.

When Debtor served Ballots (including to Schade), Debtor mischaracterized Schade as an unsecured creditor. This was done despite the fact that the Schade's filed a proof of claim for a secured claim to which Debtor has not objected. Schade returned their ballot, casting a vote to reject the plan, and denoting that they were incorrectly designated as unsecured creditors. To that end, Debtor's Report of Plan Voting acknowledged the discrepancy. However, Debtor improperly suggested (as it did for other impaired creditors) that Schade would be unimpaired because they would be paid the full amount of their secured claim. Such a statement by Debtor is disingenuous given that Debtor has sought in this bankruptcy to void the Schade's Equitable Lien for the purposes of selling the Property and acknowledges that the listing price of the Gladwyne Property is not enough to satisfy all of the creditors with a lien against the Gladwyne Property in full.[1]

Schade filed timely objections to the Plan, in part objecting to the Plan's misclassification of Schade's claim as unsecured, despite the claim being secured by the Equitable Lien on the Gladwyne Property. Schade further objected, *inter alia*, that in misclassifying their claim as

---

[1] As is discussed in Schade's response to Debtor's motion to dismiss their adversary complaint, Debtor is prone to engaging in semantics designed to play both sides of an issue to his own benefit.

unsecured, the Plan purported to avoid Schade's secured claim in order to prioritize payment to Creditor Morgan Stanley Smith Barney LLC's secured claim [Claim No. 13] over Schade's secured claim despite that Morgan Stanley's secured interest in the Gladwyne Property is not unequivocally ahead of the secured interest of Schade.

In response to Schade's objections, Debtor filed a First Amended Plan, which acknowledged that Schade would only be classified as unsecured creditor as to any deficiency claim after the sale of the Gladwyne Property. As a result, the Schade's agreed to withdraw the objection pertaining to the misclassification, given that the issue had been rectified in the First Amended Plan.

Schade withdrew other objections in the interest of allowing the Plan to be confirmed for the benefit of all creditors, but did not withdraw and, rather, pursued their objection to the Plan as being limited to just three years because the Plan, taken as whole with the term being so limited, did not meet the requisite good faith required of a Plan. This objection is amplified by the fact that the Debtor has not been required to provide any evidence to ratify the representations he has made to the Court about his admittedly unpredictable income projections.

Debtor could hardly argue that the Plan, which permits him to maintain his Bryn Mawr mansion with estimated expenses of approximately $384,000 per year, for his sole benefit and enjoyment and to the detriment of his unsecured creditors who would only be entitled to payment of less than $200,000 divided amongst their claims that together exceed $2.9 million over three years, is filed in good faith. Stated differently, Debtor retains $1,152,000 of income over the 3 year plan to maintain a standard of living he obtained on the backs of his creditors while only

putting $159,113.88 into that plan to pay unsecured creditors.[2] Seeing that he needed to be on the other side of the proverbial fence to divert attention away from this large inequity, Debtor has instead toggled back to his prior position asserting that Schade are unsecured creditors whose class voted to accept the plan and therefore, this Court should not hesitate to approve a Plan that violates 1129(a)(3), without regard for the Schade's objections. Such a change in position as to the nature of the Schade's claim is disingenuous and such a result would be inequitable, violate the provisions of the Bankruptcy Code and otherwise fail to satisfy the objectives of the Bankruptcy Code, as set forth more fully herein.

## II.    LEGAL ARGUMENT

Schade are creditors secured by the Equitable Lien on the Gladwyne Property. Debtor agrees that Schade are only in the unsecured class to the extent that there is a deficiency in the amount paid to Schade on their Equitable Lien after the Sale of the Gladwyne Property. *See* Debtor's First Amended Plan. Until there is a deficiency in the amount due to Schade, Schade are secured creditors, impaired, and do not accept the Plan. Regardless, the Court may decline confirmation of a plan that does not meet the standard of Section 1129(a)(3). *See e.g. In re: Osborne*, 2013 Bankr. LEXIS 2203. This Court has the power to review the good faith *sua sponte*, regardless of whether a party has standing, to ensure the plan is consistent with the objectives and purposes of the Bankruptcy Code. *See In re Egan*, 142 B.R. 730, 733, 1992 Bankr. LEXIS 1124, *9 (suggesting that a court my *sua*

---

[2] While sale of the Bryn Mawr mansion may not generate any excess funds out of the sale price to pay creditors who do not have a secured interest in the property, its sale and corresponding requirement that Mr. Walker attain cheaper living arrangements would make more of the pot he admits is available through his commitment to use it for his own available to pay creditors.

*sponte* declare a plan in violation of 1129(a)(3) and deny confirmation where the debtor seeks to continue a lavish lifestyle to the detriment of creditors).

In the instant case, Debtor's Plan should not be confirmed because it does not satisfy the good faith standard required by 11 U.S.C. § 1129(a)(3). Debtor's contribution of just $159,113.88 to unsecured creditors (whose total claims exceed $2.9 million) is inadequate in light of his current standard of living and the associated expense, totaling $1,152,000.00[3] under the Plan. *See* Debtor's Plan at Ex. C.

The requirement of good faith applies in every case, regardless of the status of the objecting unsecured creditor and encompasses the totality of the circumstances surrounding confirmation of a debtor's Plan of Reorganization. *In re Stigliano, Jr.*, 483 B.R. 303, 305 (Bankr. W.D. Pa. 2012) One of the circumstances courts consistently consider when conducting a good faith inquiry is a debtor's ability to repay creditors. *See, e.g., In re Fernandez*, 97 B.R. 262, 263 (Bankr. E.D.N.C. 1989) (noting that in individual chapter 11 cases, just as in chapter 13 cases, a debtor's ability to pay is certainly a factor the court considers when determining whether a plan has been proposed in good faith); *In re Harman*, 141 B.R. 878, 889 (Bankr. E.D. Pa. 1992) (stating "[A] debtor's failure to make anything close to the best offer of payment to the creditors violates both 11 U.S.C. § 1129(a)(3) and (b)(1)."); *Crestar Bank v. Walker* (In re Walker), 165 B.R. 994, 1001 (E.D. Va. 1994) (finding that the failure of a debtor to use the full reach of available resources to repay creditors is evidence of bad faith because such conduct frustrates a primary objective of the Bankruptcy Code, which is the prompt repayment of creditors); *In re Weber*, 209 B.R. 793, 798-99 (Bankr. D. Mass. 1997) ("In order to demonstrate that a debtor has made its best effort to repay

---

[3] Debtor proposes to spend $16,000 every month on household expenses, with an additional $16,000 placed into Reserve Household expenses every month. The majority of the household expenses are the result of Debtor's insistence on maintaining his Bryn Mawr Residence in where he resides alone without dependents.

creditors, it is certainly appropriate to examine both the use of the debtor's resources during the administration of a Chapter 11 case and the debtor's projected use of those resources after confirmation of the debtor's plan."); *In re Bennett*, 2008 Bankr. LEXIS 1354, at *7 (Bankr. E.D. Va. Apr. 23, 2008) (noting that "even if a plan satisfies the liquidation test, it would not satisfy the good faith requirement if the debtor had the ability to pay a greater dividend"). The ability to pay factor is not a mirror image of § 1129(a)(15), which potentially requires the commitment of all disposable income to an unsecured creditor in applicable cases. Instead, when construing this element of the good faith requirement of § 1129(a)(3), courts assess whether a debtor can commit more than proposed under his particular plan, based on his total financial scenario. The ability to pay factor is viewed through a wide lens, such that the amount of disposable income committed is but one of many ways to balance the existence of extensive resources with the objective of making a good faith effort to repay creditors.

In this case, the Debtor has over $2.9 million in unsecured debt; yet, the Debtor only proposes to pay $159,113.88 to the unsecured class. Debtor's proposal to maintain his household expenses at $32,000 per month (totaling $1,152,000.00 over the course of the three year plan) for retention of an asset that is excessive in necessity and cost as compared to a proposed distribution to unsecured creditors of just $159,113.88 over the course of three (3) years is not indicative of good faith. Debtor's extremely high income as a financial advisor and access to credit from his employer that is already protected as an administrative cost only exacerbates the issue. On these facts along, it is clear that Debtor's plan to repay creditors is not offered in good faith. Rather, it is more akin to Debtor tossing the unsecured creditors a bit of spare change on his way to enjoying time at Merion Cricket Club, where he continues to have a membership that is included in his monthly expenses.

Holding real estate with negative cash flow is undeniably an indicator of bad faith. *See Crestar Bank v. Walker (In re Walker)*, 165 B.R. 994, 1001 E.D. Va. (finding a lack of good faith and impermissible use of chapter 11 where the debtors' plan proposed to liquidate certain properties at certain minimum sale prices on an open-ended timeline, essentially allowing the debtors to ride out the real estate market in hopes of avoiding a loss on the liquidation of their assets). Courts have frequently considered lifestyle choices such as excessive expenditures to be an important factor in the good faith analysis. If a high-income debtor's plan provides for the use of such income "to make heavy mortgage payments on a lavish house, to pay for luxury cars, and to generally support an extravagant lifestyle, the plan may not meet the confirmation requirements" of the Section 1129." *In re Fernandez*, 97 BR 262,263 (Bankr. E.D. N.C. Mar 9 1989). In fact, a number of courts have denied confirmation either solely or significantly based on a finding that extravagant lifestyle choices constituted bad faith. *See, e.g., In re Kemp*, 134 B.R. 413, 416 (Bankr. E.D. Cal. 1991) (holding, where debtor had available net income of $180,000 per year but only proposed to pay $48,000 per year toward a $300,000 judgment debt, that debtor was capable of making substantially higher payments than those offered in plan); *In re Harman*, 141 B.R. 878 (Bankr. E.D. Pa. 1992) (stating male debtor had income of at least $400,000 per year, debtors maintained two homes with mortgage payments totaling $11,000, and although wife stayed home with children, debtors had significant expenditures on childcare, laundry, and maid service); *In re Weber*, 209 B.R. 793 (Bankr. D. Mass. 1997) (opining that debtors maintained two homes including vacation home with annual expenses of $21,300, traveled extensively, budgeted $1,012/month for newspapers, recreation and entertainment including a golf club membership, and budgeted $782/month for professional association meetings/continued education).

Reducing the excessive expenditure on an unnecessarily large and luxurious property that solely benefits Debtor would allow Debtor to make a more meaningful distribution to unsecured creditors. However, Debtor has expressed a refusal to sell his residence and, upon information and belief, would be unlikely to cooperate with and make a good faith effort with any sale, even if so ordered by this Court. As such, Schade urges this Court to refuse to confirm the Plan as proposed or, alternatively, to confirm the plan but extend the term of Debtor's Plan to 5 years to offset the lack of funds Debtor offers to the unsecured creditors in order to maintain his excessive and luxury lifestyle on the Main Line.

### III. CONCLUSION

For the foregoing reasons, John and Marilyn Schade respectfully request that this Bankruptcy Court enter an Order denying confirmation of the Plan or, alternatively, confirming the Plan under the condition the Plan term will be for a period of five (5) years rather than three (3) years.

Respectfully submitted,

**OFFIT KURMAN, P.A.**

By: */s/ Karin Corbett*
Joshua C. Quinter, Esquire
Karin Corbett, Esquire
401 Plymouth Road, Suite 100
Plymouth Meeting, PA 19462
Tel: (484) 531-1702
Fax: (484) 531-1735
Email: kcorbett@offitkurman.com

*Attorney for Creditors,*
*John and Marilyn Schade*

Dated: February 17, 2021

4851-0469-1165, v. 1