**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| In re: | : | CHAPTER 11 |
|  | : | Subchapter V |
| STEPHEN TODD WALKER | : |  |
|  | : |  |
| Debtor. | : | Case No. 20-13557 (ELF) |
|  | : |  |

**STEPHEN TODD WALKER'S MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF HIS FIRST AMENDED PLAN OF REORGANIZATION OF SMALL BUSINESS UNDER CHAPTER 11**

Stephen Todd Walker (the "Debtor"), by and through his undersigned counsel, hereby submits this Memorandum of Law in support of confirmation of his First Amended Plan of Reorganization of Small Business Under Chapter 11 (the "Amended Plan") over the sole remaining, limited objection of John E. Schade and Marilyn Schade (the "Schades").

## I. INTRODUCTION

After amending his plan to adequately address the separate objections of five creditors in this case, the Schades stand as the Debtor's last hurdle to confirmation of his Amended Plan, ***which has been accepted by all impaired classes, thereby making confirmation of the Debtor's Amended Plan consensual.*** After withdrawing all but one of their eleven objections to the Debtor's Amended Plan, the Schades contend that the Debtor's Amended Plan fails to satisfy the "good faith" confirmation standard under 11 U.S.C. § 1129(a)(3) and, accordingly, that this Court should deny confirmation of the Amended Plan or, alternatively, remediate the Amended Plan by extending the three-year play payment term to a five-year plan payment term.

The factual predicate for the Schades' objection is based upon a gross misrepresentation of the financial underpinnings of the Amended Plan by an outright overstatement of the Debtor's expenses, an understatement of the amounts paid to creditors as a whole and a seemingly

1

convenient omission of other funding mechanisms under the Amended Plan that redound to the benefit of unsecured creditors. Indeed, because of proactive concessions made by the Debtor, the Amended Plan, as presently constituted, is demonstrably economically better than the proposed two-year extended payment term advocated by the Schades.

But, beyond the many factual reasons why the Debtor's Amended Plan is not lacking in good faith is the extraordinary, if not dangerous, precedent that the Schades are asking this Court to set. In effect, the Schades are asking this Court to ignore the unanimous votes of acceptance by all impaired classes and thereby allow one dissident and disgruntled creditor to assert that the lack of good faith provides that creditor with full veto power over those who, with full knowledge of the economics of the Amended Plan, unanimously voted to accept the plan.

Unlike chapter 13 cases where there is no creditor voting, the hallmark of the chapter 11 confirmation process is how creditors, as a whole, have reacted to a proposed plan as measured by the affirmative votes of creditors. ***Here, the Debtor has obtained the full consent and acceptance of every impaired class in the Amended Plan, and this Court should not allow a dissenting creditor to indirectly do that which they were outvoted in doing—namely, cause this Court to reject confirmation of the Amended Plan.***

For the reasons set forth more fully herein, the Debtor respectfully requests that this Court overrule the Schades' remaining objection that the Debtor's Amended Plan lacks good faith and confirm the Debtor's Amended Plan.

## II.  LEGAL ARGUMENTS

### A.  The Standard for Plan Confirmation Under 11 U.S.C. §§ 1129(a) & 1191(a)

Section 1129(a) of the Bankruptcy Code delineates sixteen conditions that must be satisfied to confirm a plan under Chapter 11.  *See* 11 U.S.C. § 1129(a).  Satisfaction of these conditions is mandatory, with the exception of subsection (a)(8), which addresses acceptance of a plan by impaired classes, but which is not applicable to this matter since the Debtor has obtained the acceptance of ***all*** impaired classes.  *See Corestates Bank, N.A. v. United Chem. Techs., Inc.* 202 B.R. 33, 46-47 (Bankr. E.D. Pa. 1996).

Confirmation of a chapter 11 plan requires that the plan proponent meet all the requirements of section 1129(a).  *See, e.g., In re Dupell* 2000 WL 192972, at *3 (Bankr.E.D.Pa.2000).  The proponent of the plan thus bears the burden of establishing the plan's compliance with each requirement.  *In re Frascella Enterprises, Inc.*, 360 B.R. 435, 441 (Bankr. E.D. Pa. 2007).  If the proponent can demonstrate that the plan satisfies all of the Section 1129(a) conditions, the court must confirm a plan.  *In re Armstrong World Industries, Inc.,* 432 F.3d 507, 511 (3d Cir. 2005).

### B.  The Sole Objection Before this Court

Although there were six separate written objections filed with respect to the Debtor's original plan or Amended Plan, the Debtor was able to both obtain full acceptance of his Amended Plan and resolve all of the objections with the exception of the Schades' objection, which was limited to an argument that the Debtor's Amended Plan is lacking in good faith.[1]

---

[1] The Schades' memorandum of law states that they were wrongly classified in the Debtor's plan; however, the Debtor's Amended Plan modified the original plan to address that point, and the Schades withdrew that objection and all of their other objections except for the good faith objection.  Since the Debtor satisfactorily addressed the classification objection in his Amended Plan, it is not clear why the Schades refer to this issue in their Memorandum.  Regardless of the Schades' motivation, that objection has been withdrawn and is not before this Court.

3

Section 1129(a)(3) provides that the court shall confirm a plan only if "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

    C.    **The Good Faith Standard Under Section 1129(a)(3)**

"Good faith" is not defined in the Bankruptcy Code for purposes of section 1129(a)(3). *In re South Canaan Cellular Investments, Inc.*, 427 B.R. 44, 73 (Bankr. E.D. Pa. 2010). Nevertheless, "for purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 150 n. 5 (3d Cir.1986) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir.1984)); *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000).

"Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of 1129(a)(3) is satisfied." *In re Frascella Enterprises, Inc.,* 360 B.R. 435, 446 (Bankr. E.D. Pa. 2007)(quoting *Matter of T–H New Orleans Ltd. Partnership,* 116 F.3d 790, 802 (5th Cir.1997))(internal quotations and citations omitted.)

In applying section 1129(a)(3), "[t]he requisite good faith determination is based on the totality of the circumstances." *In re South Canaan Cellular Investments, Inc.,* 427 B.R. 44, 74 (Bankr. E.D. Pa. 2010)(quoting *In re Sylmar Plaza, L.P.* 314 F.3d 1070, 1074 (9th Cir. 2002)). However, such inquiries must be done on a case-by-case basis because good faith determinations are factually specific. *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 39 (Bankr. D. Colo. 1999). In assessing the totality of the circumstances, a court has "considerable discretion in finding good faith." *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001).

### D. The Schades' Objection is Factually and Legally Flawed and Should Be Overruled

The Schades advance the argument that the Debtor's Amended Plan is lacking in "good faith" because the Debtor's lifestyle increases his expenses, thereby diminishing the Debtor's disposable income and, thus, diminishing the return to unsecured creditors under the Amended Plan. Accordingly, the Schades request that this Court deny confirmation of the Amended Plan or, alternatively, require that the term of the Amended Plan be extended from three to five years.

#### 1. The Schades' Characterizations of the Debtor's Amended Plan and Amended Cash Flow Projections are Materially Inaccurate

Preliminarily, the Schades' objection is seriously flawed because, at best, the Schades demonstrate an alarming misunderstanding as to how the Amended Plan works. At worst, the Schades have distorted and manipulated their characterizations of the Amended Plan, including the amended cash flow projections, to advance their tortured agenda that the Debtor lives a "lavish" lifestyle to the direct detriment of his creditors.

The economic construct created by the Schades in support of their argument that the Amended Plan is lacking in good faith is as follows:

- The Debtor retains $32,000 per month to pay his household expenses and a reserve. *See Schades' MOL at 2, 5 at fn. 3 & 6*

- Accordingly, the Debtor incurs annual expenses of $384,000 per year or $1,152,000 over the course of the three-year plan. *See id. at 3 & 5.*

- The Debtor will pay unsecured creditors a total of $159,113.88 over the life of the three-year plan. *See id. at 3-4, 5 & 6.*

- The unsecured creditor pool consists of in excess of $2,900,000. *See id at 3, 5 & 6.*

- Accordingly, the Amended Plan allows the Debtor to maintain his "standard of living" "on the backs of his creditors . . . ." *See id at 3.*

5

Incredibly, each and every one of these characterizations, no matter how many times the Schades repeat them, is wrong.

### a. **The Schades Grossly Overstate The Debtor's Expenses**

The Schades first focus on the Debtor's expenses and characterizes them as $32,000 monthly, $384,000 annually and $1,152,000 over the life of the three-year Amended Plan. *See id.* at 3-6.

Preliminarily, built into the "Disbursements" Section of the Debtor's amended cash flow projections were two "reserve" concepts, each of which contemplated an amount held back from that month's "Disposable Income" calculation, which is the amount to be distributed by the Subchapter V Trustee to creditors under the Amended Plan each month. *See Hrg. Ex. D-7.* As the name "reserve" indicates, these are not funds that would permanently be withheld from payment to creditors, but instead, are nothing more than temporary hold backs from the Disposable Income calculation to enable the Debtor to cash flow properly throughout the life of the three-year Amended Plan.

The first reserve concept is a "Reserve – Household Expenses" in the monthly amount of $16,000 over the entire life of the three-year Amended Plan. *See id.* Conceptually, this is necessary to ensure that in any given month the Debtor has an adequate amount of cash remaining to pay all of his household expenses for the next calendar month. Absent this concept, the Debtor would be left in the untenable situation of having no money at the start of each month to pay his expenses in the ordinary course.

The second reserve concept is a "Cash Flow Reserve," which, similar to the Reserve – Household Expenses, is not in the nature of a disbursement, but an amount of cash that would be held back from that month's "Disposable Income" calculation to ensure that there is sufficient

cash to pay future expenses and plan disbursements as they arise over the life of the three-year Amended Plan.

Indeed, all of the combined "Reserve – Household Expenses" and "Cash Flow Reserve" are reflected in each following calendar month in the first line item "Carry Over From Reserve," which combines the reserves from the prior month as the opening cash for the next month. *See id.* For example, in March of 2021, the Debtor projects a Reserve – Household Expense of $16,000 and a Cash Flow Reserve of $30,000. *See id.* This combined amount of $46,000 is not disbursed by the Debtor, but instead, is carried over as the opening balance or the "Carry Over From Reserve" amount in April of 2021 and constitutes cash that is used to fund expenses and plan disbursements in April of 2021 and prospectively. *See id.*

Accordingly, contrary to what the Schades argue, the Debtor's monthly household expenses are $16,000, not $32,000, because the second $16,000 entry is a reserve that constitutes cash used in the immediately following month as the opening cash amount. As are result, the Schades grossly misstate the Debtor's expenses by exactly twice of his actual projected household expense amount because the reserve disbursement in one month is offset dollar for dollar by the opening balance carried over to the following month. As a result, the Debtor's monthly household expenses are $16,000 or $192,000 annually or $576,000 over the life of the three-year plan, not twice those amounts as argued by the Schades.

b. **The Schades Grossly Understate The Amounts Paid to Creditors**

In addition to overstating by a multiple of two the Debtor's household expenses, the Schades magnify their distortion of the Amended Plan economics by grossly understating the amounts being paid to creditors by stating that creditors are paid a mere $159,113.88 over the life of the three-year Amended Plan. *See Schades' MOL at 3-4, 5 & 6.*

7

Specifically, pursuant to the Debtor's amended cash flow projections *and as disclosed by the Debtor in his Amended Plan*, the total amount payable by the Debtor from his Disposable Income is *$488,061.82* as follows (*see Hrg. Ex. D-7; see also Hrg. Ex. D-6 at 5)*:

**2021 - $275,240.94**
**2022 - $124,085.44**
**2023 - $76,735.44**
**2024 - $12,000**[2]

Furthermore, while the Schades prefer to focus only on the unsecured non-priority class, they conveniently omit significant payments made to other creditors in the case in the aggregate amount of approximately $329,000, which includes $106,617 paid to the Schades' daughter, Dorothy Schade Walker, who is the Debtor's estranged spouse.

The Schades also conveniently overlook the fact that the Debtor projects paying an additional $183,000 on account of "Domestic Support Obligations" for the benefit of his children (i.e., the Schades' grandchildren). *See Hrg. Ex. D-7.* Since these amounts are paid as a direct deduction from the Debtor's pay, they are not included in distributions under the Amended Plan, but nevertheless are obligations that are being funded by the Debtor (or, phrased differently, if they were not an obligation of, and paid by, the Debtor, they would increase his Disposable Income calculation by $183,000 over the life of the three-year Amended Plan).

The Schades' material omissions do not end there. By the Debtor selling the "Gladwyne Property," he projects having approximately $700,000 available for distribution after payment of customary closing costs and the two mortgage liens that encumber the property. *See Hrg. Ex. D-6 at 11.* Although not memorialized in any of the many pleadings that the Schades have filed in

---

[2] The Debtor's amended cash flow projections ended in 2023, but because it is anticipated that the Debtor's Amended Plan would go effective in March of 2021, the three-year plan period would go through February of 2024. Accordingly, since the Debtor projected his Disposable Income to be approximately $6,000 at the end of 2023, the Debtor added two additional months at $6,000 per month to his aggregate Disposable Income calculation.

this bankruptcy case, the Schades shared with the Court that they believe that their so-called equitable mortgage has priority over the judgment lien of Morgan Stanley Smith Barney, LLC ("Morgan Stanley") on the yet to be formally pled theory that Morgan Stanley's judicial lien should be equitably subordinated to the equitable mortgage of the Schades.[3] If the Schades have so much confidence in their theory, the full amount of their claim will be paid from the sale of the Gladwyne Property, thereby completely undermining their objection that the Amended Plan is lacking in good faith.

But even if, as the Debtor believes, the Schades are wrong about their equitable mortgage and equitable subordination theories, Morgan Stanley will be paid approximately $700,000 from the sale of the Gladwyne Property, which will reduce their unsecured claim by the same amount. *See id.* Contrary to the Schades' contention that there is $2,900,000 in unsecured debt, as stated by the Debtor in his Amended Plan, the pool of unsecured creditors will be more in the range of $2,140,000 as a result of the Debtor's efforts to sell the Gladwyne Property for the benefit of his creditors. *See id. Ex. D-6 at 5*.

### 2. The Amended Plan Actually Pays Unsecured Creditors A Faster and Greater Return Than What They Would Receive Pursuant To The Schades' Proposed Five-Year Plan

Beyond the numerous and material factual inaccuracies peddled by the Schades, their position is legally flawed because the Debtor has made contributions and adjustments to how much he devotes to his Amended Plan such that the financial disparity bemoaned of by the Schades is actually illusory. In fact, the Debtor is devoting to the payment of creditors an

---

[3] Even if the Schades elect to move forward with their dubious theory, the Schades perfected their alleged equitable mortgage by filing their notice of *lis pendens* on May 27, 2020, which was within 1 year of the September 1, 2020 petition date. Accordingly, whether the Schades realize it or not, their equitable mortgage, even if proven and if found to be paramount to the judicial lien of Morgan Stanley, will likely be avoided as a preferential transfer.

amount comparable to, if not in excess of, that which would be paid over the additional two years that the Schades are asking to be added to the Amended Plan's present three-year term.

If the Court were to adopt the Schades' request to extend the term of the Amended Plan from three years to five years (i.e., an additional two years), based upon the Debtor's amended cash flow projections, the amount payable to the Debtor's creditors would increase by approximately $144,000 by taking the Debtor's monthly Disposable Income at the end of the three-year terms and multiplying it by 24 (i.e., monthly Disposable Income of $5,994.62 x 24 months = $143,870.88). *See Hrg. Ex. D-7.* But, as stated on the record at the confirmation hearing, creditors are actually receiving a greater and faster return under the Debtor's Amended Plan vis-à-vis the Schades' proposed two additional years to the Amended Plan term.

Specifically, pursuant to 11 U.S.C. § 1191(c)(2)(A), "As of the effective date of the plan[,] the plan provides that all of the projected disposable income the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, ***beginning on the date that the first payment is due under the plan will be applied to make payments under the plan*** (emphasis added)." As set forth in the Debtor's amended cash flow projections, the Debtor's anticipated Disposable Income as of the expected March 2021 effective date is $12,269.62. *See Hrg. Ex. D-7.* Yet, the Debtor's Amended Plan contemplates that the full amount accrued by the Debtor from the petition date in the projected amount of $63,544.74 (i.e., January Disposable Income of $21,275.12 and February Disposable Income of $42,269.62) will be used to pay creditors under the Amended Plan. *See id.* Accordingly, the $63,544.74 is an additional amount that the Debtor is devoting to payments under the Amended Plan.

In addition and yet even more pronounced is that the Debtor's projected cash flows reflect a tax escrow that is purposefully inadequate because the Debtor wishes to increase the

return to his creditors. More specifically, the Debtor is receiving "loans" from his employer, which, once certain criteria have been satisfied, will be converted to and taxed as ordinary income to the Debtor. *See Hrg. Ex. D-6 at 2.* Accordingly, the Debtor's Amended Plan provides for a "Tax Escrow Account" into which the Debtor is permitted to escrow a sum sufficient to pay taxes once the "loans" become ordinary income to the Debtor. *Id.*

As stated on the record and as reflected in the Debtor's December Operating Report, the Debtor received a loan from his employer in December of 2020 in the amount of $100,000. Furthermore, the Debtor's amended cash flows project receipt of "Loans" in an additional aggregate amount of $500,000 through January of 2022. *See Hrg. Ex. D-7.*

Consistent with the Amended Plan, the Debtor anticipates taxes on his income at an approximate rate of 35%, which would mean that $210,000 in post-petition taxes could, if not should, be placed in the Tax Escrow Account and, accordingly, not be part of the Debtor's Disposable Income and, thus, not be available for distribution to creditors under the Amended Plan.

Nevertheless, the Debtor's amended cash flows project only $100,000 escrowed in the "Income Tax Escrow For Loans" in January of 2022, not the full $210,000 in expected tax liabilities. *See id.* As a result, the Amended Plan contemplates the Debtor contributing an additional $110,000 (i.e., the difference between the expected tax liability of $210,000 and the $100,000 escrow amount) towards his Disposable Income over the life of the three-year Amended Plan. *See id.*

As a result of the Debtor's intended underfunding of the Tax Escrow Account by $110,000 and the devotion of pre-Effective Date income in the amount of $63,544.74, the Debtor is paying $173,544.74 more to creditors pursuant to his Amended Plan. This is nearly $30,000

more than what creditors would receive if the Debtor did not make the significant contributions set forth above and if, as requested by the Schades, the Amended Plan term was extended for two additional years. As a result, the Debtor is not only paying more to creditors as a whole under the Amended Plan, but is paying them two years faster than what the Schades are seeking.

### 3. The Good Faith Confirmation Standard Cannot and Should Not Be Used By A Single Disgruntled Creditor To Derail Confirmation Where the Debtor Has Achieved Unanimous Creditor Consent and Acceptance

As noted above, the Debtor has obtained full and unanimous consent and acceptance of his Amended Plan by all classes entitled to vote. *See Hrg. Ex. D-6 (as modified by oral presentation of Debtor's Counsel at confirmation hearing).* The Debtor did so with full and adequate disclosure to his creditors, who, by voting to accept the Amended Plan, acknowledge and accept the Disposable Income construct created by the Debtor, including the nature and amount of his expenses. The Debtor submits that the overall acceptance and support of his Amended Plan is even more compelling here because the Debtor achieved consent through the assistance and ultimate support of the Subchapter V Trustee, who recommended confirmation.

This then begs the critical legal question of whether a single creditor can effectively undermine the voices of *all* other classes of creditors in this case by advancing an objection to "good faith" to subvert that which creditors have voted to unanimously accept. In this regard, ***the Debtor could find no legal precedent for the proposition that a plan could be lacking in good faith even though accepted by all classes of creditors.***

Nevertheless, the illogic of the Schades' position is palpable. In effect, the Schades seek their own unique veto power, which is inconsistent with the voting scheme codified in chapter 11 of the Bankruptcy Code and directly at odds with the premium placed on a debtor obtaining the

consent and acceptance of all impaired classes, not to mention contrary to the linchpin of the Subchapter V process of utilizing a Trustee to seek class consensus.

As noted above, good faith addresses whether "a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 150 n. 5 (3d Cir.1986) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir.1984)); *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000). Allowing a dissident and disgruntled creditor to subvert the express wishes of all other classes of creditors in the case can hardly be viewed as consistent with the objectives and purposes of the Bankruptcy Code.

Here, the Debtor, with full disclosures to creditors, has proposed a legitimate way to reorganize his affairs in such a way that every creditor in the case benefits, and therefore the Amended Plan is compatible with the good faith requirement of 1129(a)(3). *In re Frascella Enterprises, Inc.,* 360 B.R. 435, 446 (Bankr. E.D. Pa. 2007)(quoting *Matter of T–H New Orleans Ltd. Partnership,* 116 F.3d 790, 802 (5th Cir.1997))(internal quotations and citations omitted.)

When applying a totality of the circumstances measure to the Amended Plan, including the fact the Debtor has made economic concessions to ameliorate the return to creditors in way that the Debtor believes is actually better than what the Schades are requesting, the Debtor submits that this Court should not render all other creditors voiceless and, instead, confirm the Amended Plan over the Schades' objection.

13

**III.     CONCLUSION**

For all of the reasons set forth above, the Debtor respectfully requests that this Court overrule the Schades' objection, enter an order confirming the Debtor's Amended Plan and grant such other and further relief as is just.

                                                         Respectfully submitted,

Date:  February 23, 2021                    By:   /s/ David B. Smith
                                                         David B. Smith, Esquire
                                                         Michael P. Donohue, Esquire
                                                         Smith Kane Holman, LLC
                                                         112 Moores Road, Suite 300
                                                         Malvern, PA 19355
                                                         (610) 407-7215
                                                         *Attorneys for Defendant*
                                                         *Stephen Todd Walker*