United States Bankruptcy Court

Eastern District of Pennsylvania

In re:                                                                          Case No. 20-13557-elf

Stephen Todd Walker                                                             Chapter 11

    Debtor

# CERTIFICATE OF NOTICE

| | | |
|---|---|---|
| District/off: 0313-2 | User: admin | Page 1 of 3 |
| Date Rcvd: Apr 30, 2021 | Form ID: pdf900 | Total Noticed: 10 |

The following symbols are used throughout this certificate:

**Symbol**    **Definition**

\+               Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP.

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on May 02, 2021:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | + | Stephen Todd Walker, 611 Rose Lane, Bryn Mawr, PA 19010-3644 |
| aty | + | SMITH KANE HOLMAN LLC, 112 Moores Road Ste 300, Malvern, PA 19355-1002 |
| acc | | Beucler, Kelly & Irwin, Ltd., 125 Strafford Avenue, Suite 116, Wayne, PA 19087-3388 |
| r | + | Damon Michels, Fox & Roach Realtors, 854 Montgomery Avenue, Narberth, PA 19072-1939 |
| cr | | John E. Schade, 1020 Rickerts Road, Hilltown, PA 18927 |
| NONE | | Marilyn E., 1020 Rickerts ROad, Hilltown, PA 18927 |
| cr | | Marilyn Schade, 1020 Rickerts Road, Hilltown, PA 18927 |
| cr | + | Noone & Borger, LLC, 32 South Church Street, West Chester, PA 19382-3221 |
| cr | + | Sidkoff, Pincus & Green, P.C., Sidkoff, Pincus & Green, P.C, 1101 Market Street, 27th Floor, Phila.,, PA 19107-2927 |

TOTAL: 9

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**

Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | Notice Type: Email Address | Date/Time | Recipient Name and Address |
|---|---|---|---|
| NONE | Email/Text: RVSVCBICNOTICE1@state.pa.us | May 01 2021 03:47:00 | Commonwealth of Pennsylvania Department of Revenue, Bureau of Compliance, Dept. 280946, Harrisburg, PA 17128-0946 |

TOTAL: 1

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

**I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: May 02, 2021                    Signature:        /s/Joseph Speetjens

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on April 30, 2021 at the address(es) listed below:**

**Name**                    **Email Address**

ANDREW L. SPIVACK

on behalf of Creditor HSBC BANK USA  NATIONAL ASSOCIATION AS TRUSTEE FOR SEQUOIA MORTGAGE TRUST
2007-2 andrew.spivack@brockandscott.com, wbecf@brockandscott.com

ANDREW L. SPIVACK

on behalf of Creditor HSBC Bank USA  National Association et al andrew.spivack@brockandscott.com,
wbecf@brockandscott.com

ANDREW L. SPIVACK

on behalf of Creditor BANK OF AMERICA  N.A. andrew.spivack@brockandscott.com, wbecf@brockandscott.com

CHARLES GRIFFIN WOHLRAB

on behalf of Creditor GOLDMAN SACHS MORTGAGE COMPANY cwohlrab@raslg.com

DAVE P. ADAMS

on behalf of U.S. Trustee United States Trustee dave.p.adams@usdoj.gov

DAVID B. SMITH

on behalf of Debtor Stephen Todd Walker dsmith@skhlaw.com  b.dr70286@notify.bestcase.com

DAVID B. SMITH

on behalf of Defendant Stephen Todd Walker dsmith@skhlaw.com  b.dr70286@notify.bestcase.com

DENISE A. KUHN

on behalf of Commonwealth of Pennsylvania Department of Revenue dkuhn@attorneygeneral.gov

ERIK L. COCCIA

on behalf of Creditor Morgan Stanley Smith Barney  LLC ecoccia@dilworthlaw.com

IRA A. GLAUBER

on behalf of Creditor Morgan Stanley Smith Barney  LLC iglauber@dilworthlaw.com

JEROME B. BLANK

on behalf of Creditor HSBC BANK USA  NATIONAL ASSOCIATION AS TRUSTEE FOR SEQUOIA MORTGAGE TRUST
2007-2 paeb@fedphe.com

JOSHUA C. QUINTER

on behalf of Plaintiff Marilyn Schade jquinter@offitkurman.com  tkerns@offitkurman.com

JOSHUA C. QUINTER

on behalf of Creditor Marilyn Schade jquinter@offitkurman.com  tkerns@offitkurman.com

JOSHUA C. QUINTER

on behalf of Plaintiff John E. Schade jquinter@offitkurman.com  tkerns@offitkurman.com

JOSHUA C. QUINTER

on behalf of Creditor John E. Schade jquinter@offitkurman.com  tkerns@offitkurman.com

KARIN CORBETT

on behalf of Creditor John E. Schade kcorbett@offitkurman.com  cballasy@offitkurman.com

KARIN CORBETT

on behalf of Marilyn E. kcorbett@offitkurman.com  cballasy@offitkurman.com

KARIN CORBETT

on behalf of Creditor Marilyn Schade kcorbett@offitkurman.com  cballasy@offitkurman.com

KARIN CORBETT

on behalf of Plaintiff John E. Schade kcorbett@offitkurman.com  cballasy@offitkurman.com

KARIN CORBETT

on behalf of Plaintiff Marilyn Schade kcorbett@offitkurman.com  cballasy@offitkurman.com

LARRY M. KELLER

on behalf of Creditor Sidkoff  Pincus & Green, P.C. lmk@sidkoffpincusgreen.com

MARIO J. HANYON

on behalf of Creditor BANK OF AMERICA  N.A. wbecf@brockandscott.com, wbecf@brockandscott.com

MATTHEW A. HAMERMESH

on behalf of Interested Party Dorothy Walker mhamermesh@hangley.com
ecffilings@hangley.com;kem@hangley.com;mjl@hangley.com

MATTHEW J. BORGER

on behalf of Creditor Noone & Borger  LLC matt@nooneborger.com

REBECCA ANN SOLARZ

on behalf of Creditor PNC BANK  NATIONAL ASSOCIATION bkgroup@kmllawgroup.com

RICHARD E. FURTEK, CPA

rfurtek@furtekassociates.com  cref11@trustesolutions.net

ROBERT M. GREENBAUM

District/off: 0313-2                        User: admin                        Page 3 of 3

Date Rcvd: Apr 30, 2021                    Form ID: pdf900                    Total Noticed: 10

on behalf of Debtor Stephen Todd Walker rgreenbaum@skhlaw.com  rgreenbaum@skhlaw.com

United States Trustee

USTPRegion03.PH.ECF@usdoj.gov

YONIT A. CAPLOW

on behalf of Creditor Morgan Stanley Smith Barney  LLC ycaplow@dilworthlaw.com,
cchapman-tomlin@dilworthlaw.com,cct@dilworthlaw.com;mdolan@dilworthlaw.com


TOTAL: 29

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| IN RE: | STEPHEN TODD WALKER, | : | Chapter 11 |
| | | : | |
| | Debtor | : | Bky. No.  20-13557 ELF |

# O P I N I O N

## I.  INTRODUCTION

On September 1, 2020, Stephen Todd Walker ("the Debtor") filed this bankruptcy case under subchapter V of chapter 11 of the Bankruptcy Code.  On February 10, 2021, the court held a confirmation hearing on the Debtor's proposed chapter 11 plan.

Presently before the court is the Objection to Confirmation ("the Objection") filed by creditors John and Marilyn Schade (collectively, "the Schades").  Following the hearing, the Schades and the Debtor filed memoranda in support of their respective positions, the last of which was on February 23, 2021.

The Schades assert a single objection: that the plan was not proposed in good faith, as required by 11 U.S.C. §1129(a)(3).

For the reasons set forth below, the Objection will be overruled and the Debtor's plan will be confirmed.

## II.  BACKGROUND

## A.  FACTS

The Debtor is an individual who has worked as a financial adviser in well-paid, executive positions for various companies since 1993. During the pendency of this case, he obtained this court's approval to enter an employment relationship with Aegis Capital Corporation ("Aegis").

1

The compensation arrangement includes a series of "loans" from Aegis to the Debtor that are forgivable based on either certain performance benchmarks achieved by the Debtor or his length of service. The "loans" will be advanced in increments up to a total of $800,000.00. The initial $100,000.00 was disbursed upon court approval of the compensation arrangement.

In addition to the forgivable loans, the Debtor expects to generate additional income based on compensation derived from the services provided to Aegis' clients. Over the course of the Debtor's proposed three (3) year chapter 11 plan, he projects gross (pre-tax) annual income ranging between almost $360,000.00 and $525,000.00

The Debtor owns two (2) properties on the Philadelphia "Main Line" (collectively, "the Properties"), one referred to as "the Gladwyne Property" and the other referred to as "the Bryn Mawr Property." The Properties have a combined value of approximately $2.7 million and are encumbered by several mortgages. In addition, Morgan Stanley Smith Barney LLC ("Morgan Stanley"), a former employer of the Debtor, holds a claim secured by the Properties based on a judgment lien. Morgan Stanley's claim is approximately $1.8 million. The aggregate liens exceed the value of the Properties.

The Schades filed a proof of claim in which they contend that their claim of approximately $315,000.00 is secured by an equitable lien on the Properties that has priority over the Morgan Stanley judgment lien. The Debtor and Morgan Stanley dispute the existence and asserted priority of the purported equitable lien.

The Debtor estimates the value of his personal property is approximately $33,000.00, of which slightly under $14,000.00 is not exempt and therefore, available for distribution creditors. See 11 U.S.C. §522(b)(2), (d).

Among the Debtor's unsecured creditors is his estranged spouse, Dorothy Walker ("Mrs.

2

Walker").[1]  Mrs. Walker and the Debtor are in the midst of divorce proceedings in state court.

Mrs. Walker filed a $1.1 million proof of claim in this case.  She filed the claim as a priority

claim based on its asserted status as a domestic support obligation ("DSO").  See 11 U.S.C.

§§507(a)(1), 101(14A).

The Claims Register reflects that general unsecured claims in excess of $669,000.00 have

been filed.  This amount does not include the undersecured portion of the Morgan Stanley claim,

which likely is more than $1 million, see n.3, infra.  Nor does it include the Schades' claim, if

that claim is not supported by an equitable lien and therefore, is unsecured.[2]  Thus, the allowable

unsecured claims likely exceed $2 million.

## B.  The Plan

The Debtor filed his initial proposed chapter 11 plan on November 25, 2020 and an

amended plan ("the Plan") on February 1, 2021.

To fund the Plan, the Debtor proposes to sell the Gladwyne Property to satisfy the two (2)

mortgages that encumber the property.  Sale of the Gladwyne Property also will pay part of the

Morgan Stanley secured claim (leaving the balance as an unsecured claim).[3]  The balance of the

Plan will be funded by the Debtor's earned income.

---

[1]    Mrs. Walker is the Schades' daughter.

[2]    There also are several creditors with allowed unsecured claims by virtue of being listed on the Debtor's Schedule E/F.  See Fed. R. Bankr. P. 3003(b)(1).

[3]    The Debtor projects that the Morgan Stanley $1.8 million claim will be reduced by approximately $700,000.00 through the sale of the Gladwyne Property.  In the Report of Plan Voting, the Debtor was more conservative, treating Morgan Stanley as entitled to vote a claim in excess of $1.2 million.  (See Doc. # 114).

3

The Debtor proposes to retain and reside in the Bryn Mawr Property and continue to pay the associated mortgage and other expenses as they fall due.  The Debtor projects  that he needs $16,000.00 per month for his mortgage and other household and living expenses.[4]

---

[4]    The Debtor made this projection on a spreadsheet attached to the Plan ("the Spreadsheet").

In their Objection, the Schades interpret the Spreadsheet to mean that the Debtor is reserving $32,000.00 each month for household expenses.  The Debtor contends that that Schades have misread the Spreadsheet.  The Debtor is correct.

The Debtor explains that he needs a reserve fund because his income is expected to fluctuate.  The reserve fund is designed to ensure that the Debtor has sufficient cash on hand to pay monthly expenses as they fall due.

The Schades mistaken belief that the Debtor is setting aside $32,000.00 each month for household expenses is based on the fact that the Spreadsheet refers to two (2) separate monthly "Disbursements" of $16,000.00: one for "Household expenses" and another for "Reserve – Household Expenses."  (See Doc. # 132, pp. 20-22.)  However, only the former is actually used for household expenses.  The Reserve represents funds that are withheld from that month's available income, but then the funds are carried over (in addition to any monthly funds from the "Cash Flow Reserve") and added back into the next month's income. Since the $16,000.00 in monthly "Reserve – Household Expenses" disbursements are merely carried over to the next month's income, the funds are ultimately distributed to unsecured creditors.

The Spreadsheet does not include an itemization of the $16,000.00 projected for monthly household expenses.  Based on his previously filed Schedule J, I infer that most of the $16,000.00 in monthly expenses breaks down roughly as follows:

| | |
|---|---|
| Mortgage, real estate taxes Maintenance and utilities | $9,000.00 |
| Automobile/ related transportation | $1,600.00 |
| Health insurance | $1,000.00 |
| Entertainment | $1,000.00 |
| Food and clothing | $1,100.00 |

I recognize that the above expenses total only $13,700.00, not $16,000.00.  There are some small amounts in Schedule J that I did not include in the above listing.  Also, I presume that this "cushion" will be spent by increased amounts on various expenses.

I note also that the projected $16,000.00 per month in living expenses ***does not include*** the Debtor's ongoing alimony/support obligation to Mrs. Walker.

4

Based on his projected earnings and expenses, the Plan provides a fund for distribution to unsecured creditors over a three (3) year period of $488,061.82. After payment of administrative expenses, priority tax claims, Mrs. Walker's §507(a)(1) priority DSO and payments to effect a cure of certain prepetition mortgage delinquencies, the Plan projects that $159,500.00 will be distributed to the holders of unsecured claims.[5] This represents a 7.5% distribution to general unsecured creditors (because the Plan estimates that the unsecured creditor constituency is approximately $2,140,000.00).[6]

### C.  Plan Voting

All the secured creditors in this case (each separately classified) have accepted the Plan.

In the Report of Plan Voting, the Debtor reported that the unsecured creditor class accepted the Plan. Six (6) unsecured creditors voted to accept the Plan while two (2) unsecured creditors voted to reject it. The creditors supporting the Plan hold claims totaling $1,871,481.51, representing 84.6% of the voting claims, while the rejecting creditors hold claims totaling $340,035.15, representing 15.4% of the voting claims.[7] See 11 U.S.C. §1126(c).

---

[5]    The Plan provides for distributions to Mrs. Walker totaling $106,500.00. This is far less than the amount of priority claim that she filed. But she eventually withdrew her objection to confirmation the Plan.

[6]    This amount includes the estimated unpaid balance of the Morgan Stanley claim following the sale of the Gladwyne Property. It also includes the Schades' claim on the assumption that it will be determined to be unsecured.

[7]    The Schades voted to reject the Plan. Their vote represented $315,825.00 of the $340,035.15 (more than 92%) of the claims voting to reject the Plan.

5

Based on the Report of Plan Voting, the Debtor seeks confirmation under 11 U.S.C. §1191(a).

### D.  The Objection to Confirmation

The Debtors' proposed plans triggered six (6) objections to confirmation filed by: the Schades; Mrs. Walker; the Commonwealth of Pennsylvania Department of Revenue; and three (3) holders of mortgages on the Properties (PNC Bank, National Association; Goldman Sachs Mortgage Company; and HSBC Bank USA, National Association as Trustee for Sequoia Mortgage Trust 2007-2).

By the time the confirmation hearing was held, only the Schades' objection remained, paired down considerably.  At the hearing, they limited their objection to a single ground: the Plan does not satisfy the requirements of 11 U.S.C. §1129(a)(3).[8]  Section 1129(a)(3) requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law."

More specifically, the Schades assert that the Plan's proposed distribution to general unsecured creditors of approximately $159,000.00 is inadequate.  They posit that good faith in an individual chapter 11 case requires that the debtor make his or her best effort to repay creditors. (Schade Mem. at 5-6) (unpaginated).[9]  They contend that the Debtor seeks to maintain a luxurious lifestyle at the expense of his creditors, rather than "commit[ting] the full range of the [his] resources to repayment" of his debt, In re Walker, 165 B.R. 994, 1002 (E.D. Va. 1994).

---

[8]    Depending on how one reads their written, filed objection, the Schades initially raised between eight (8) and eleven (11) grounds for the denial of confirmation of the Plan.

[9]    The Schades cite a number of cases in support of this proposition, including In re Weber, 209 B.R. 793, 798-99 (Bankr. D. Mass. 1997); In re Harman, 141 B.R. 878, 889 (Bankr. E.D. Pa. 1992) (per Scholl, J.).

The Schades posit that, given the Debtor's insistence on retaining his Main Line residence with the accompanying, unnecessarily high expenses, good faith requires, as a *quid pro quo* for this monthly expense level and lifestyle, that the Debtor extend the Plan to five (5) years, i.e., add two (2) additional years of plan distributions for the benefit of general unsecured creditors.  The Schades take this position notwithstanding that neither 11 U.S.C. §1191(a) nor §1191(b), (c)(2) mandates that the Debtor propose a five (5) year plan.[10]

### E.  The Debtor's Response

In response, the Debtor contends that the Objection is factually flawed in at least three (3) ways.

First, the Debtor points out --  accurately  --  that the Schades have overstated the amount of the Debtor's monthly living expenses.  See n.4, supra.

Next, the Debtor suggests that by focusing solely on the $159,500.00 projected distribution to general unsecured creditors, the Schades overlook the substantial distribution the Debtor proposes to make to other unsecured creditors.  For example, the Schades' daughter, Mrs. Walker  stands to receive approximately $106,000.00 in distributions, not to mention ongoing alimony/support.  The Plan also provides for payment of priority tax claims of approximately $38,000.00 and administrative expenses of approximately $115,000.00.[11]

---

[10]        Cf. 11 U.S.C. §1325(b)(4)(A) (in a chapter 13 case, if the trustee or unsecured creditor objects to confirmation, a debtor whose "current monthly income" is "above median" must propose a five (5) year plan).  I will discuss the relevant statutory provisions in more detail in Part III.A., infra.

[11]        I do observe that the Plan proposes to cure an existing delinquency on a mortgage on the Debtor's residence in excess of $50,000.00.  This is another addition to the substantial carrying costs the Debtor incurs by continuing to reside in the property.

Finally, the Debtor argues that the Plan provides a greater distribution to creditors than the alternative urged by the Schades.

Based on the Debtor' disposable income and projected expenses (including the residential expenses at issue), increasing the plan term by two (2) years would result in an additional $144,000.00 in distributions to general unsecured creditors.  However, according to the Debtor, the Plan provides more than the additional $144,000.00 requested by the Schades based on "voluntary" supplements to the Plan distribution fund of more than $170,000.00.

In asserting that he is paying more than that required by the statute, the Debtor employs 11 U.S.C. §1191(c)(2)(A) as a "base line."[12]  Strictly speaking, §1191(c)(2)(A) is not applicable because the Debtor seeks confirmation under §1129(a), not §1129(b).  Even so, the Debtor is suggesting (and I agree) that provides a standard that reference to §1191(c)(2)(A) is helpful evaluating good faith under §1129(a)(3).

Section 1191(c)(2)(A) provides that, in a case under subchapter V of chapter 11, to be "fair and equitable" to a class of unsecured creditors, a plan must provide that:

> all of the projected disposable income of the debtor to be received in the 3-year period, or such longer period not to exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

Section 1191(c)(2)(A) requires the submission of projected disposable income "beginning on the date that the first payment is due under the plan."  The Debtor suggests that based on his income and expense projections, the Plan does just as required.  Moreover, the Debtor says that he has added two (2) supplemental funding sources.

The first source of the Debtor's "supplemental" funding is the money that has accumulated, post-petition/pre-confirmation  --  i.e., the Debtor is adding his *actual* disposable

income earned during the post-petition/pre-confirmation period to post-confirmation, *projected* disposable income earned after the date the first plan payment is due.  The Debtor calculates the post-petition/pre-confirmation amount as more than $60,000.00

The second source of "supplemental" funding is a little less intuitive.  The Debtor's projections include an escrow expense for the income tax obligation that he will incur as his employer's "loans" are forgiven and treated as taxable income.  Based on an estimated tax rate of 35% on this income, the Debtor calculates that he will incur $210,000.00 in tax debt.  However, the Spreadsheet projection provides for a tax escrow of only $100,000.00.  By understating the tax escrow, the Debtor has artificially increased his projected disposable by $110,000.00.  This amount, added to the $60,000.00 in post-petition/pre-confirmation disposable income totals $170,000.00.

## III. DISCUSSION

### A.  §1129(a)(3): Legal Principles

The sole issue in this case is whether the Debtor has established that he proposed the Plan in good faith as required by 11 U.S.C. §1129(a)(3).

The Third Circuit has provided some guidance in applying this confirmation requirement:

> In analyzing whether a plan has been proposed in good faith under §1129(a)(3), the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.  Specifically, under Chapter 11, the two recognized policies, or objectives, are preserving going concerns and maximizing property available to satisfy creditors.

In re Am. Cap. Equip., LLC, 688 F.3d 145, 156–57 (3d Cir. 2012) (quotations and citations omitted).

In <u>American Capital</u>, the court identified several other bankruptcy policies to be considered in evaluating good faith:

- Giving debtors a fresh start in life;

- Discouraging debtor misconduct;

- the expeditious liquidation and distribution of the bankruptcy estate to its creditors; and

- achieving fundamental fairness and justice.

<u>Id.</u> at 157.

Given these wide-ranging policy concerns stated above (one of which is especially broad and general: "fundamental fairness and justice"), it is not surprising that courts analyze good faith under 11 U.S.C. §1129(a)(3)  based on the "totality of the circumstances."  <u>See, e.g.</u>, <u>In re Brown</u>, 498 B.R. 486, 494 (Bankr. E.D. Pa. 2013) (collecting cases), <u>aff'd</u>, 505 B.R. 638 (E.D. Pa. 2014).

There is another pertinent and important principle to be considered in evaluating whether a chapter 11 plan has been proposed in good faith under §1129(a)(3).  The good faith requirement in 11 U.S.C. §1129(a)(3) should be construed narrowly, particularly when raised by a dissenting creditor whose class has voted to accept the plan.

Under the Bankruptcy Code, good faith is a requirement that arises in a variety of contexts.[13]  Most analogous to the §1129(a)(3) requirement that a plan be proposed in good faith are the equivalent provisions regarding plans in chapter 12 and 13 cases,[14] as well as the

---

[13]     <u>See, e.g.</u>, 11 U.S.C. §§109(c), 362(c), 363(m), 364(e), 521(i), 524(l), 542(c), (d), 548(c), 549(c), 550(b), (e), 707(b), 727(a), 746(a), 921(c), 1113(b), 1114(f), 1125(e), 1126(e), 1144, 1225(a), 1325(a),

[14]     <u>See</u> 11 U.S.C. §§1225(a)(3); 1325(a)(3); <u>see also</u> 8 <u>Collier on Bankruptcy</u> ¶ 1225.02

judicially created requirement that a chapter 7 or chapter 11 case initially be filed in good faith.[15]

Whether at the initial filing stage or at confirmation, a finding of a lack of good faith serves as a general bar to the relief the Bankruptcy Code offers. In these contexts, courts generally have agreed that the good faith doctrine is a narrow one.[16]

There is good reason for a narrow application of this statutory provision.

As the case at bar illustrates, the good faith inquiry may come into play only if a debtor has satisfied the other applicable conditions set by statute for obtaining bankruptcy relief. Thus, the good faith requirement serves as a final check, or a "catch-all"[17] to prevent misuse of the bankruptcy system.[18]

---

(Richard Levin and Henry J. Sommer eds., 16th ed. 2021) ("Collier") (good faith plan proposal standards in chapters 11, 12 and 13 are the same).

[15]    See In re Tamecki, 229 F.3d 205 (3d Cir. 2000) (good faith is an implied requirement in filing a voluntary petition under chapter 7); In re SGL Carbon Corp., 200 F.3d 154, 162 (3d Cir. 1999) (good faith is an implied requirement in filing a voluntary petition under chapter 11).

[16]    Tamecki, 229 F.3d at 207 (citing In re Zick, 931 F.2d 1124, 1129 (6th Cir.1991) (chapter 7 good faith filing requirement); Educ. Assistance Corp. v. Zellner, 827 F.2d 1222, 1227 (8th Cir. 1987), (referring to the "narrow focus" of the good faith requirement under §1325(a)(3)); In re Orawsky, 387 B.R. 128, 153–54 & nn. 44-45 (Bankr. E.D. Pa. 2008) (discussing good faith under 11 U.S.C. 1325(a)(3) and collecting cases).

[17]    Collier ¶ 1225.02.

[18]    The Debtor argues, as a threshold matter, that the good faith requirement in §1129(a)(3) cannot be used to deny confirmation of a plan that has been accepted by all voting classes of creditors. (Debtor's Mem. at 12) ("*the Debtor could find no legal precedent for the proposition that a plan could be lacking in good faith even though accepted by all classes of creditors*") (emphasis in original).

This is incorrect for three (3) reasons.

First, the legal proposition offered by the Debtor would read 11 U.S.C. §1129(a)(3) out of the statute as a distinct confirmation requirement.

11

Several courts have recognized that a robust application of the good faith doctrine creates a risk that the court's analysis will lapse into an inquiry, that "may clothe subjective moral judgments with the force of law."[19]  Further, a broad application of the good faith requirement also would "create an undue risk of judicial usurpation of the legislative power to determine the scope of and eligibility for [bankruptcy] relief."  Glunk, 342 B.R. 717, 732 (Bankr. E.D. Pa. 2006).

Consequently, denial of bankruptcy relief based on a lack of good faith "should be confined carefully and is generally utilized only in  .  .  .  egregious cases."  In re Falch, 450 B.R. 88, 93 (Bankr. E.D. Pa. 2011) (quoting In re Zick, 931 F.2d 1124, 1129 (6th Cir.1991)).

Given the narrow application of 11 U.S.C. §1129(a)(3) and the court's obligation to consider the totality of the circumstances, I disagree with those courts that may have suggested that good faith under 11 U.S.C. §1129(a)(3) *inflexibly* requires that a debtor make his or her best effort to make every possible resource available for repaying creditors. Rejection of such a broad

---

Second, as discussed in the text above, it would undermine the statutory purposes of the provision -- allowing the court to ensure that the plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code and is fundamentally fair and just).

Third, there is precedent for denial of confirmation of a chapter 11 plan based on a §1129(a)(3) objection raised by an outvoted, dissenting unsecured creditor. See Weber, 209 B.R. at 798-99; Walker, 165 B.R. at 1002–03 (E.D. Va. 1994).

[19]     In re Glunk, 342 B.R. 717, 731 (Bankr. E.D. Pa. 2006) (quoting Sarasota, Inc. v. Weaver, 2004 WL 2514290, at *3 (E.D. Pa. Nov. 5, 2004)), aff'd 2003 WL 23709465 (D. Me. Sept. 19, 2003), aff'd 379 F.3d 1 (1st Cir. 2004); see also In re Keach, 243 B.R. 851, 867 (1st Cir. BAP. 2000) (in context of good faith inquiry in chapter 13 case, pointing out the danger of "[a]pplying individualized standards of moralistic decision-making reserved only for Congress"); In re Devine, 1998 WL 386380, at *5 (Bankr. E.D. Pa., July 7, 1998) (acknowledging subjectivity of judicial determinations under the chapter 13 disposable income test).

and strict good faith requirement is especially appropriate in a subchapter V case in which the debtor seeks confirmation under 11 U.S.C. §1191(a).

Section 1191(a) incorporates by reference all of the confirmation requirements of 11 U.S.C. §1129(a), *except §1129(a)(15)*.  Section 1129(a)(15) provides that in order for a plan to be confirmed in the chapter 11 case of an individual, upon objection of an unsecured creditor, the plan must provide that the debtor's projected disposable income as defined in 11 U.S.C. §1325(b)(2) is devoted to the plan for at least five (5) years.

The omission of §1129(a)(15) from the confirmation requirements under §1191(a) sends a clear legislative message that decision whether a plan's funding justifies confirmation should be resolved by the creditor voting process and chapter 11's fundamental policy of "creditor democracy."  See, e.g., Matter of Mother Hubbard, Inc., 152 B.R. 189, 195 n.14 (Bankr. W.D. Mich. 1993).  When the affected creditors support confirmation of a plan, the court generally should be circumspect about overriding the expressed will of the voting creditors based on the good faith requirement of 11 U.S.C. §1129(a)(3).  This narrow application of 11 U.S.C. §1129(a)(3)  is especially apt in a case under subchapter V.


**B.  The Debtor Has Met His Burden Under 11 U.S.C. §1129(a)(3)**

To obtain confirmation of the Plan under chapter 11 of the Bankruptcy Code, the Debtor has the burden of proving that the plan satisfies all the confirmation requirements of the Bankruptcy Code, here, 11 U.S.C. §1191(a) and §1129(a).  See, e.g., In re Alfaro, 501 B.R. 292, 294 (Bankr. E.D. Pa. 2013).

The Debtor has met his burden.

To be sure, the Schades' objection is by no means strained or frivolous.  Any court

13

should have serious concerns about approving an individual's reorganization plan in which the debtor proposes to live alone in a large residence, while paying arguably unnecessarily high carrying costs -- roughly $9,000.00 per month  --  thereby reducing the available distribution to creditors.  If I were a creditor voting on the Plan, I conceivably might choose to vote to reject the Plan absent more evidence that the Debtor is making some tangible sacrifices in order to repay his debts.  *But the subjective reaction of a bankruptcy judge to a debtor's proposed plan is not the test by which good faith is measured under 11 U.S.C. §1129(a)(3).*  Rather, the good faith determination requires objective consideration of the totality of the circumstances.  In the end, the critical issue is whether a plan adheres sufficiently to Bankruptcy Code policy and is sufficiently fair to warrant a finding that it was proposed in good faith.

My ruling on the issue in this case is guided by the narrow scope of the court's review.

In evaluating the good faith of the proposed Plan, it is extremely significant that the unsecured class of creditors voted overwhelmingly in support the Plan.  The parties most directly affected prefer that this Plan be confirmed.  Presumably, these creditors made a business judgment that any misgivings they may have regarding the Debtor's lifestyle and the likely accompanying reduction in their potential distribution under the Plan were outweighed by the benefits conferred by the Plan.

While not conclusive, the unsecured creditor vote in this case carries great weight.  Of course, there is a point where a plan will cross the line and, even with creditor support, a plan may be so inconsistent with bankruptcy policy or otherwise so fundamentally unfair that a court should heed the objection of a dissenting creditor and deny confirmation.  Where a plan falls on that spectrum is a judgment call left to the discretion of the bankruptcy judge.  See Tamecki, 229 F.3d at 207.

14

Here, I find that the Plan falls inside boundaries of the good faith.

Aside from the creditor vote itself, I am convinced by the Debtor's arguments that he has voluntarily put additional money into the Plan, which would not necessarily be required by the strict statutory requirements. While he is reluctant to make certain sacrifices that perhaps in some moral sense he "should," in order to maximize the repayment his creditors, he has attempted to ameliorate the impact of his desire to retain his residence by supplementing the fund available for distribution, as described in Part II.E, supra. In other words, the Debtor has not attempted to gain every possible advantage potentially provided by statute or to otherwise "game the system." That choice connotes good faith.

Further, while the primary objection here is that the Debtor wishes to maintain a certain lifestyle while performing his Plan obligations and pay personal expenses at a questionable level, he has not gone "overboard." Other than the excessive housing expense, the additional amounts that he wishes to set aside for living expenses during the life of the Plan are not exorbitant.

In short, while it may be true that the Debtor could provide a greater distribution to creditors, I find that the Plan is neither so unfair or offensive to basic notions of justice nor so inconsistent with bankruptcy policy as to warrant court intervention to overrule the will of voting creditors.

## IV. CONCLUSION

For the reasons stated above, the Schades' Objection to confirmation of the Debtor's Plan will be overruled and an order will be entered confirming the Plan.

15

**Date:   April 30, 3021**

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**