UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| STEPHEN TODD WALKER, | : | Bankruptcy No. 20-13557(ELF) |
| *Debtor.* | : | |
| JOHN E. SCHADE AND MARILYN SCHADE, | : | Adversary No. 20-00280 |
| *Plaintiff,* | : | |
| v. | : | |
| STEPHEN TODD WALKER, | : | |
| *Defendant.* | : | |

**AMENDED COMPLAINT OF CREDITOR PLAINTIFFS,
JOHN E. SCHADE AND MARILYN SCHADE,
AGAINST DEBTOR DEFENDANT, STEPHEN TODD WALKER,
<u>OBJECTING TO DISCHARGE OF DEBTS</u>**

Creditors John E. Schade and Marilyn Schade ("**Plaintiffs**"), by their undersigned counsel, file this Amended Complaint Objecting to the Discharge of Debts (the "**Amended Complaint**") against the Debtor Stephen Todd Walker (the "**Debtor Defendant**") and, in support thereof, state as follows:

<u>**Nature of Action and Reservation of Rights**</u>

1. By this Amended Complaint, Plaintiffs – for whom Debtor served as a financial advisor and were Debtor Defendant's in-laws – object to the discharge of the debt owed to them by the Debtor Defendant on the basis that the Debtor Defendant defrauded Plaintiffs and breached his fiduciary duties to Plaintiffs. *See* 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), 523(a)(4), and

523(a)(6).

2. It was only through fraudulent misrepresentations regarding a number of issues, including *inter alia* Debtor Defendant's promise to repay the loans and statements that he would provide a security interest against real estate owned by Debtor Defendant to ensure repayment of the loans, that Plaintiffs were induced to loan $315,825.10 of their life savings to their son-in-law; and these loans were provided from financial accounts owned by Plaintiffs and managed by Debtor Defendant.

3. Debtor Defendant is a sophisticated money manager and, unfortunately, used these skills to swindle Plaintiffs by obtaining loans he had no intention of repaying and effectively stealing the money from Plaintiffs by way of fraud.

4. More specifically, Debtor Defendant is a senior financial manager who has held jobs at some of the most prestigious wealth management firms.

5. He is an experienced and well-versed financial planner who is able to stage-manage financial circumstances to his advantage – particularly against unsuspecting individuals with whom he had gained significant trust.

6. Debtor has a history of misrepresentations to Plaintiffs that are clearly documented:

   a. January 24, 2018, email string referencing the promise of a security interest on the Property, attached as Exhibit 1;

   b. June 5, 2019, email string referencing the security interest and addressing the request by Debtor to re-label the loans as "gifts", attached hereto as Exhibit 2;

   c. May 29, 2019, letter from Plaintiff to Debtor confirming promise to place security interest on the Property, attached hereto as Exhibit 3; and

   d. January 3, 2018, letter from Plaintiff to Debtor – as directed by Debtor –

allowing Debtor to take money directly out of Plaintiff's account handled by Debtor as their money manager to pay legal fees required for Debtor to maintain his FINRA license, attached hereto as Exhibit 4.

7. Debtor also undertook conduct which violated his fiduciary duty to Plaintiffs as their financial advisor.

8. More specifically, Debtor managed Plaintiffs' money and was aware of each transaction that took place in their account.

9. On one occasion, Debtor noted that Plaintiffs receive $200,000 in their account as a result of the sale of their home in Florida.

10. Debtor called Plaintiff in a matter of a day and asked if he could borrow $200,000 from Plaintiff; and when Plaintiff indicated he did not think he had that kind of money Debtor confirmed that amount arrived in Plaintiff's account.

11. But for Debtor being Plaintiff's financial advisor, Debtor would not have had access to this information and/or the ability to make this request.

12. On another occasion, Debtor took direction instructed Plaintiff to send him a letter directing the payment of $40,000 out of one of the accounts Debtor was managing for Plaintiffs to the law firm Montgomery McCracken to pay legal fees Debtor represented were needed to appeal an arbitration award entered against Debtor by Morgan Stanley that jeopardized his FINRA license. *See* Exhibit 4.

13. In this instance, Debtor was undeniably borrowing money from the account of a client to whom he had a fiduciary duty to further his own interests as a financial advisor; and while it the client was also a family member in this instance, the effect of having a client pay professional legal expenses is nonetheless a breach of the fiduciary duty.

14. By way of one further example, Debtor's employer (RBC) became aware of the loans that Debtor took from Plaintiff at one point.

15. Debtor communicated to Plaintiff that he needed Plaintiffs to make a misrepresentation his employer, RBC, that the loans were actually gifts in order to allow him to maintain his employment.

16. In effect, Debtor asked Plaintiff to make a material misrepresentation to the very firm who held and managed their money in order to allow Debtor to keep his job with that same company.

17. Debtor also communicated these same messages that constitute a breach of his fiduciary duties through third parties. *See* Scott Donahue Email, a true and correct copy of which is attached hereto, made a part hereof, and marked as Exhibit 5.

18. The money provided to Mr. Walker for the loans was also consistently drawn from accounts Mr. Walker was managing for Plaintiffs; and it was Mr. Walker's relationship to Plaintiffs as their financial advisor that allowed him to know when they had money to borrow and direct the transfer of funds in their accounts himself.

19. There were a number of circumstances that created a unequal relationship between Mr. Walker and Plaintiff:

    a. Mr. Walker relayed that he needed to keep his job in order to be able to provide Plaintiffs daughter and their grandchildren after the then pending messy divorce proceeding ended;

    b. Mr. Walker was holding all of Plaintiffs liquid assets and, because he could see when money came into the account as their financial advisor, he could and did ask for more money when he saw the Plaintiff had it to lend;

        c.        Mr. Walker had a superior understanding of the tax code and other elements of the financial market that allowed him to engage in a kind of "double-speak" that manipulated the Plaintiffs into following his advice and allowed him to take the loans, list them as gifts on his tax returns while agreeing to repay the money as borrowed funds, and then later rely on the previous "gift" label as a way to avoid repaying the loans when the relationship broke down.

20.    It is Debtor's long history of financial misrepresentations and corresponding trouble with FINRA that provide the context to explain that the factual assertions made by Plaintiff are both plausible and likely.

21.    Debtor Defendant also worked for Morgan Stanley in a senior wealth management role some time ago; and that relationship ended in extensive litigation over misconduct and a demand by Morgan Stanley that Debtor Defendant repay a loan in excess of $1 million.

22.    It is believed, and therefore averred, that Debtor Defendant made comparable misstatements to Morgan Stanley regarding his financial condition that contributed to his dismissal from that position.

23.    In fact, the issues Debtor Defendant allegedly faced as a result of his dispute with Morgan Stanley became the foundation on which Debtor Defendant preyed on Plaintiffs.

24.    Debtor Defendant indicated that he was in financial difficulty as a result of his loss of employment and the ongoing legal dispute with Morgan Stanley; and he convinced Plaintiffs that his situation resulted in the expenditure of a large amount of financial resources which was preventing him from providing for his family.[1]

---

[1] By way of example, without limitation, the arbitration between Debtor Defendant and Morgan Stanley resulted in a judgment against Debtor Defendant in the amount of $1.9 million and resulted in a current lawsuit against Debtor Defendant by his attorneys for in excess of $1 million in unpaid legal fees.

25. Importantly, this legal fight that Plaintiffs were drawn into related to Debtor's work as a financial advisor and his long term ability to maintain his license with FINRA; so the loans provided to Debtor were at least in part made to Debtor in his role as their financial advisor so that he could continue to manage their money.

26. Debtor Defendant then relied on his close personal relationship with the Plaintiffs as their son-in-law and as their financial advisor to borrow the sums of money to cover business and legal expenses, as well as other costs Debtor Defendant was required to pay; and Debtor Defendant's need to maintain his FINRA license and current employment as a financial advisor in order to care for Plaintiffs' daughter and their grand-children while Debtor Defendant was at the heart of Debtor's stated reason for borrowing money from Plaintiffs while he worked through the financial distress in which he said he found himself.

27. These promises were also made and the loans provided at a time when Debtor Defendant effectively controlled all or most of Plaintiffs financial affairs based on his position of trust as a sophisticated wealth manager and their son-in-law.

28. Debtor Defendant's assertions that he could not afford to cover these various expenditures, however, were later determined to be false on the basis that he continued to finance litigation over many additional years, obtained new employment which should have resulted in substantial income, obtained a new loan of approximately $1.3 million from his employer RBC, and continued to live a lavish lifestyle that includes a living in a Bryn Mawr mansion and belonging to one of the most exclusive private clubs in the country at Merion Cricket Club.

29. Despite verbal promises to provide a second mortgage on residential real estate in Gladwyne owned by Debtor Defendant to secure repayment of the loaned amounts, Debtor Defendant started using his financial savvy and constant legal fights to obfuscate and refuse

repayment the loans.

30. In one instance, Debtor Defendant even notified Plaintiffs that he would have his lawyers draw up the papers for the note and mortgage despite having no intention of having these documents prepared or executed. *See* Exhibit 1.

31. This is particularly alarming considering, at all times material hereto, Debtor Defendant was a close and trusted advisor to the Plaintiffs as their money manager in control of their banking and investment accounts at RBC, he monitored them regularly, and he was in a position of power given his far greater knowledge of finance and money management.

32. It was this multi-layered fiduciary relationship that Debtor Defendant used to manipulate Plaintiffs into providing him with money that he had no intention of repaying and subsequently undertake a premeditated effort to avoid repayment of the loaned amounts.

### Debtor Defendant's Admission of the Loaned Amounts

33. Debtor Defendant borrowed a total of $315,825.10 in four separate installments.

34. Each of the loan disbursements occurred after Debtor Defendant approached the Plaintiffs asking to borrow money based on need, the implicit assumption that it was required to save his family and his job for the benefit of their daughter, their grandchildren, and their own financial future, and that, *inter alia*, a security interest would be provided on the Property.

35. After receiving the funds, Debtor Defendant then decided on the use, methodology, and recipient of the loan proceeds.

36. In furtherance of his deception, much of the money provided by Plaintiffs was used to fund ongoing legal disputes that were essential to Debtor maintaining his FINRA license and the ability to continue as a financial advisor as opposed to supporting his family and taking other affirmative steps to improve his career.

37. On one occasion, Debtor Defendant personally asked to borrow this money from the Plaintiffs shortly after he noticed a deposit of similar size in the Plaintiffs RBC account upon sale of their home in Florida; and, importantly, this was information Debtor Defendant would not have had access to had he not been managing Plaintiffs money for them.

38. At that time, Debtor Defendant mischievously represented that the payment was a loan to help Debtor Defendant until his pending litigation with Morgan Stanley was over.

39. Debtor Defendant approached the Plaintiffs again in late 2017 and asked for more money to help with his alleged financial difficulties during the ongoing litigation.

40. A check for $75,000 provided by Plaintiffs for Debtor Defendant's benefit; and the devious plot to defraud Plaintiffs was in full display when Debtor Defendant asked Plaintiffs to make the check payable to Debtor Defendant's then wife and Plaintiffs daughter, Dorothy Walker.

41. The entire amount of $75,000, however, was used to pay obligations owed by Debtor Defendant.

42. Another payment was made by wire to the law firm of Montgomery McCracken to assist Debtor Defendant in paying legal fees for the appeal of the FINRA arbitration award obtained by Morgan Stanley.

43. Debtor Defendant duplicitously claimed that the ongoing fight was necessary to preserve his ability to continue working as a money manager and to take care of his family; and this wire was done at the explicit direction of Debtor Defendant and with the knowledge that the money was being paid on Debtor Defendant's behalf to continue protecting his FINRA license needed to continue working in financial services.

44. Plaintiffs had no fee agreement with Montgomery McCracken, were not clients of the firm, and were not involved in the FINRA arbitration in any way; and Plaintiffs continued to

allow Debtor Defendant to borrow money because he falsely promised he would pay it back, he would provide a security interest in the Gladwyne property he owned, and that he could manage his way out of financial crises as an expert in the field.

45.     Shortly after the $40,000 payment was made, Plaintiff John E. Schade again inquired in writing about the previously discussed mortgage to be placed on one of Debtor Defendant's property to secure the amounts owed to the Plaintiffs.

46.     Debtor Defendant responded by acknowledging that Montgomery McCracken was working on the appeal and relaying that his lawyers would draw up the necessary papers to memorialize the loaned sums and security interest after the appeals were filed; but Debtor Defendant did not intend to follow through with this promise and in fact never provided the promised papers.  *See* Exhibit 1.

47.     A final payment was made in August 2018 directly to Haverford School, at the explicit instruction of Debtor Defendant himself, to cover tuition for Debtor Defendant's children under a contractual obligation Debtor Defendant had with the school.

48.     Debtor Defendant falsely stated at the time, and reinforced that dishonest statement since then, that he considered the money a loan and intended to repay it.

49.     Despite bountiful evidence demonstrating that Plaintiffs made the payments to Debtor Defendant based on representations that they were loans, they would be protected with a security interest, and a false sense of trust created by Debtor Defendant that he would repay them as such, Debtor Defendant continue to manipulate his own obligations by denying he made such promises and attempting to reclassify the payments as gifts.

50.     Debtor Defendants representations were, and remain, knowingly false; and they are nothing short of a flabbergasting attempt to avoid repaying the substantial sums he took and used

9

for his own benefit under false pretenses.

51. Plaintiffs sought to collateralize the substantial sums of money loaned to Debtor Defendant and to seek repayment of the loaned amounts.

52. Plaintiffs' repeated efforts to get Debtor Defendant to follow through on the steps he agreed to take to protect Plaintiffs from the risk of any failure to repay the loan were rebuffed time and again because this was always Debtor Defendant's plan.

53. The failure of Debtor Defendant to carry through with his promises ultimately led Plaintiff John E. Schade to inquire with Debtor Defendant's then current employer, RBC, about the borrowed amount and Debtor Defendant's unwillingness to repay the amounts owed.

54. In an ultimate affront to Plaintiffs, Debtor Defendant effectively conceded that he had obtained the money from them by fraud when he approached Plaintiffs and asked them to misrepresent to RBC that the money he received from them was a "gift" (rather than a loan) in order for him to keep his job. *See*, e.g. Exhibit 5.

55. Critically, there would be no reason for Debtor Defendant to undertake such a concerted effort to falsely reclassify the borrowed amounts as something else unless the money was in fact a loan that he did not want to repay.

56. His protestations to the contrary, Debtor Defendant did in fact agree to allow Plaintiffs to take a second lien on 1150 Youngsford Road in Gladwyne, Pennsylvania (the "Gladwyne Property") along with the related improvements – which Debtor Defendant alone owns – to secure repayment of the loaned proceeds.

57. Debtor Defendant agreed to have his attorney draw up the papers for Plaintiffs to be provided with a second lien on the Gladwyne Property, presumably in the form of a note and mortgage, to repay the amounts Debtor Defendant owed to Plaintiffs. *See* Exhibit 1.

10

58. It was the promises to repay the loaned amounts and provide the afore-mentioned security interest that induced Plaintiffs to loan the amounts to Debtor Defendant; and Debtor Defendant preyed on the special fiduciary relationship he had with them as their son-in-law and their sophisticated money manager.

59. The promises to repay the amounts owed and the papers to create the security interest were empty and never materialized; and the agreed upon security in the form of a second position on the Gladwyne Property never occurred.

60. By the late spring of 2019, the matter was pressing and it became apparent Plaintiffs that Debtor Defendant never intended to repay the loaned amounts or provide the promised security interest.

61. There is no dispute that Debtor Defendant received the benefit of the loaned amounts since they were used to pay obligations Debtor Defendant had to third parties.

62. Furthermore, Debtor Defendant does not deny that the loaned amounts were paid to him and that he used them for his own benefit; but he does claim, despite his own written statements to the contrary, that they were never loans, he never agreed to repay them, and he never agreed to provide a security interest against the Gladwyne property.

63. Instead, Debtor Defendant has obfuscated and delayed repayment of the loan proceeds and refused to follow through on the second position lien promised to Plaintiffs.[2]

64. By way of example, without limitation, an ongoing dialogue between Plaintiff John Schade and Debtor Defendant clearly shows Debtor Defendant representing that he owes the claimed principal amount of the loan and interest; but Debtor Defendant relies on his superior wealth management skills to obfuscate further by disputing the tax burden for the loan proceeds.

---

[2] Debtor Defendant's position is even more disingenuous since he has admitted to the loans and the fact that he had yet to repay them in other legal proceedings. This Court should take judicial notice of this fact.

*See* Email of June 5, 2019, a true and correct copy of which is attached hereto, made a part hereof, and marked as Exhibit 6.

65. This was nothing more than an attempt to further lead Plaintiffs to the conclusion that Debtor Defendant would repay the amounts Plaintiffs paid to him despite the fact Debtor Defendant had no intention of doing so.

66. Despite repeated attempts to obtain a security interest in the Gladwyne Property and/or collect repayment of the loaned amount from Debtor Defendant, Plaintiffs have not received a single payment from Debtor Defendant despite the alleged admission that the money was in fact a loan; and the promised lien papers were never prepared or provided.

67. As of June 2019, Debtor Defendant owed Plaintiffs $357,153.76 in principal and interest. *See* Ex. 2.

68. It has become apparent that Debtor Defendant never had any intent to repay any portion of the loaned sums and falsely represented his need for the loaned sums, his intentions to repay the loaned sums, his intention to provide Plaintiffs with a mortgage on the Property, and other aspects other than his financial condition.

69. In fact, Debtor Defendant committed this fraud and defalcation while acting in a fiduciary capacity and misappropriated funds from Plaintiffs.

**Count I – Plaintiffs John E. Schade and Marilyn Schade**
**False Pretenses, False Representations or Actual Fraud**
**11 U.S.C. §523(a)(2)(A)**

70. The facts and averments set forth in the preceding paragraphs of this Amended Complaint are incorporated herein and made a part of this Count I as if full restated.

71. Debtor Defendant induced Plaintiffs into make the Loan of $315,825.10 to him by false pretenses, false representations, or actual fraud.

72. Debtor Defendant induced Plaintiffs to make the Loan by falsely asserting, *inter*

12

*alia*, an intention to execute and deliver a mortgage to grant Plaintiffs a lien against the Property securing Debtor Defendant's obligations under the Note.

73. Debtor Defendant knew that his representations regarding his need for the Loan, his intent to repay the Loan, and his intent to deliver the mortgage were false at the time he made them or made such representations with such reckless disregard for the truth that knowledge of the falsity of the statements can be imputed to Debtor Defendant.

74. Upon information and belief, this promise was part of a pattern by Debtor to make similar promises to provide a security interest on the Property to obtain loans from other sources for his own benefit.

75. Debtor made additional false representations that the loans were required to allow him to maintain legal actions necessary to maintain the FINRA license required for him to keep working in his profession; and this representation had unusual weight to it given that Debtor was married to Plaintiff's daughter and was the only income for their family.

76. These misrepresentations continued as Debtor alternated between labeling admitting the money was a loan and identifying it as a gift depending on which description suited his needs at the time.

77. Debtor Defendant made the false representations described in this Amended Complaint with the intent and for the purpose of deceiving and defrauding Plaintiffs to obtain the loans that Plaintiff now seeks to make non-dischargeable and recover.

78. With justification, including the close familial and professional fiduciary relationships Plaintiffs had with Debtor Defendant, relied upon the false and or fraudulent misrepresentations.

79. Plaintiffs suffered damages in the amount of at least $315,825.10, plus attorneys'

fees as a direct result of their reliance upon Debtor Defendant's false pretenses, misrepresentations, and/or fraud.

**WHEREFORE**, Plaintiffs John E. Schade and Marilyn Schade respectfully request that the Court grant the following relief:

(A) Enter an Order that Debtor Defendant's debts to Plaintiffs are not discharged pursuant to 11 U.S.C. §523(a)(2)(A);

(B) Enter an Order that Debtor Defendant's Non-Dischargeable Debt owed to Plaintiffs is for compensatory damages of at least $315,825.10, plus costs and attorneys' fees; and

(C) Enter an Order granting Plaintiffs such other and further relief as this Court deems fair and just.

**Count II – Plaintiffs John E. Schade and Marilyn Schade
False Pretenses, False Representations or Actual Fraud
11 U.S.C. §523(a)(2)(B)**

80. The facts and averments set forth in the preceding paragraphs of this Amended Complaint are incorporated herein and made a part of this Count II as if fully restated.

81. Debtor Defendant used written statements that were materially false respecting, *inter alia*, the Debtor Defendant's financial condition, his intention to repay the loaned amounts, and his intention to provide a security interest to protect Plaintiffs in relation to the loaned amounts.

82. Those statements included the following written communications:

a. January 24, 2018, email string referencing the promise of a security interest on the Property, attached as Exhibit 1;

b. June 5, 2019, email string referencing the security interest and addressing the request by Debtor to re-label the loans as "gifts", attached hereto as Exhibit 2;

c. May 29, 2019, letter from Plaintiff to Debtor confirming promise to place

14

security interest on the Property, attached hereto as Exhibit 3; and

    d.    January 3, 2018, letter from Plaintiff to Debtor – as directed by Debtor – allowing Debtor to take money directly out of Plaintiff's account handled by Debtor as their money manager to pay legal fees required for Debtor to maintain his FINRA license, attached hereto as Exhibit 4.

83.    Plaintiffs reasonably relied upon those statements by Debtor Defendant.

84.    Debtor Defendant made the statements with the intent to deceive Plaintiffs.

**WHEREFORE**, Plaintiffs John E. Schade and Marilyn Schade respectfully request that the Court grant the following relief:

    (A)    Enter an Order that Debtor Defendant's debts to Plaintiffs are not discharged pursuant to 11 U.S.C. §523(a)(2)(B);

    (B)    Enter an Order that Debtor Defendant's Non-Dischargeable Debt owed to Plaintiffs is for compensatory damages of at least $315,825.10, plus costs and attorneys' fees; and

    (C)    Enter an Order granting Plaintiffs such other and further relief as this Court deems fair and just.

**Count III – Plaintiffs John E. Schade and Marilyn Schade**
**Fraud While Acting in Fiduciary Capacity**
**11 U.S.C. §534(a)(4)**

85.    The facts and averments set forth in the preceding Paragraphs of this Amended Complaint are incorporated herein and made a part of this Count III as if fully restated.

86.    Pursuant to 11 U.S.C. §534(a)(4), individual debtors are not discharged from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. 11 U.S.C. §534(a)(4).

87.    Debtor Defendant committed a fraud while acting in a fiduciary capacity as

Plaintiffs money manager when he borrowed $315,825.10 from Plaintiffs to engage in litigation he represented was necessary to maintain his FINRA license – and thus his ability to work in the financial services industry – and then asked Plaintiff to make misrepresentations to his employer about the loans in order for him to remain employed.

88. Plaintiffs placed Debtor Defendant into a position of trust and granted him authority to act on their behalf in his position as their financial advisor, including but not limited to: entrusting Debtor Defendant to manage, approve and assess their financial investments, including the Loans, as well as providing access to and utilizing confidential information with regards to the Plaintiffs' finances to perform his job duties.

89. By voluntarily and willfully accepting and assuming the authority and responsibilities outlined in the previous paragraph, Defendant Debtor became an entrusted fiduciary of Plaintiffs.

90. Debtor Defendant accepted and acted on the authority granted by the Plaintiffs through accepting the position as their financial advisor.

91. Debtor Defendant had the right to control Plaintiffs' financial investments and Plaintiffs trusted that Debtor Defendant would complete his job duties for the Plaintiffs' benefit and not for his own personal benefit.

92. Debtor Defendant owed fiduciary duties to Plaintiffs with respect to matters within the scope of his employment as Plaintiffs' financial advisor.

93. Debtor Defendant breached those fiduciary duties by using his position as Plaintiffs' financial advisor in order to obtain funds from Plaintiffs for his own benefit, including to pay for professional and personal obligations, failing to disclose to Plaintiffs all material facts surrounding his self-dealing transactions, deceiving the Plaintiffs regarding the true intent of the

loans requested by him, and refusing to provide security for the loans as promised.

94. More specifically, Debtor managed Plaintiffs' money and was aware of each transaction that took place in their account.

95. On one occasion, Debtor noted that Plaintiffs receive $200,000 in their account as a result of the sale of their home in Florida.

96. Debtor called Plaintiff in a matter of a day and asked if he could borrow $200,000 from Plaintiff; and when Plaintiff indicated he did not think he had that kind of money Debtor confirmed that amount arrived in Plaintiff's account.

97. But for Debtor being Plaintiff's financial advisor, Debtor would not have had access to this information and/or the ability to make this request.

98. On another occasion, Debtor took direction instructed Plaintiff to send him a letter directing the payment of $40,000 out of one of the accounts Debtor was managing for Plaintiffs to the law firm Montgomery McCracken to pay legal fees Debtor represented were needed to appeal an arbitration award entered against Debtor by Morgan Stanley that jeopardized his FINRA license. *See* Exhibit 4.

99. In this instance, Debtor was undeniably borrowing money from the account of a client to whom he had a fiduciary duty to further his own interests as a financial advisor; and while it the client was also a family member in this instance, the effect of having a client pay professional legal expenses is nonetheless a breach of the fiduciary duty.

100. By way of one further example, Debtor's employer (RBC) became aware of the loans that Debtor took from Plaintiff at one point.

101. Debtor communicated to Plaintiff that he needed Plaintiffs to make a misrepresentation his employer, RBC, that the loans were actually gifts in order to allow him to

maintain his employment.

102. In effect, Debtor asked Plaintiff to make a material misrepresentation to the very firm who held and managed their money in order to allow Debtor to keep his job with that same company.

103. Debtor also communicated these same messages that constitute a breach of his fiduciary duties through third parties. *See* Scott Donahue Email, a true and correct copy of which is attached hereto, made a part hereof, and marked as Exhibit 5.

104. Furthermore, Debtor Defendant's failure to properly vet the financial expenditure of the Loans, as well as improperly utilizing Plaintiffs' confidential information that was only available to Debtor Defendant because he was their financial advisor, was in furtherance of Debtor Defendant's scheme to deceive the Plaintiffs and misappropriate their assets, which further evidences Debtor Defendant's breach of his fiduciary duties.

105. Plaintiffs reasonably relied upon the belief that Debtor Defendant, as their financial advisor, would only recommend financial expenditures that were in Plaintiffs' best interests and would not recommend an investment or loan that would exclusively benefit Debtor, was risky, or was unlikely to be repaid.

106. Plaintiffs' reliance on Debtor as their financial advisor make these actions by Debtor clear violations of his fiduciary duty to them; and these breaches proximately caused injury to the Plaintiffs.

107. Pursuant to 11 U.S.C. §534(a)(4), as a result of Debtor Defendant's fraud or defalcation while acting in a fiduciary capacity, the damages sustained by Plaintiffs are not dischargeable in bankruptcy.

**WHEREFORE**, Plaintiffs John E. Schade and Marilyn Schade respectfully request that the Court grant the following relief:

(A) Enter an Order that Debtor Defendant's debts to Plaintiffs are not discharged pursuant to 11 U.S.C. §523(a)(4);

(B) Enter an Order that Debtor Defendant's Non-Dischargeable Debt owed to Plaintiffs is for compensatory damages of at least $315,825.10, plus costs and attorneys' fees; and

(C) Enter an Order granting Plaintiffs such other and further relief as this Court deems fair and just.

Respectfully submitted,

**OFFIT KURMAN, P.C.**

By: */s/ Joshua C. Quinter*
Joshua C. Quinter, Esquire (PA ID No. 87583)
Karin Corbett, Esquire (PA ID No. 208418)
Kathryn Pettit, Esquire (PA ID No. 311684)
401 Plymouth Road, Suite 100
Plymouth Meeting, PA 19462
Telephone: (484) 531-1701
Facsimile: (484) 531-1735
E-mail: jquinter@offitkurman.com
    kcorbett@offitkurman.com
    kpettit@offitkurman.com

*Attorneys for Plaintiffs Creditors,
John E. Schade and Marilyn Schade*

Dated: August 9, 2021

4851-7742-5652, v. 1